GEORGE GRAY, *et al.* v. JOSEPH STILES, *Treasurer, et al.*

(Filed September 2, 1897.)

1. TENDER—*Sufficiency of—Rule Defined.* Upon an injunction against a county treasurer to restrain the collection of taxes, a part of which are legal and a part of which are illegal, the petitioners having averred in their petition that they had tendered the amount admitted to be due, less an increase in the levy of 45 per cent. averred to be illegal, and that the defendant treasurer refused to receive the sum unless the amount claimed as due under the levy of 45 per cent. is also paid, and that the treasurer notified the plaintiffs that they need not make any further tender and that he would refuse such a tender if made, and would not accept payment except of the whole tax, or of the one-half of said whole tax, including said 45 per cent., and this averment is not denied in the answer, but it is admitted therein that the tender was made as alleged, but it was not kept good by bringing the money into court, no legal or equitable issue is proffered by the defendant, because the statute does not require any such payment of the true and just amount of taxes due except before the judgment prayed for, and because, when a tender of money is alleged in any pleading, it is not necessary to deposit the money in court when the pleading is filed, but it shall be sufficient if the money is deposited in court at trial or when ordered by the court. No such judgment has been entered as prayed for, nor has any order of the court been passed whereby it has become incumbent upon the plaintiff to make or aver any tender other or further than that which is admitted by the pleadings that the treasurer has refused to receive unless the amount claimed by him to be due under said levy of 45 per cent. is also paid.

2. WAIVER. The positive refusal of the treasurer to receive the part of the taxes admitted by the plaintiff to be due, unless the whole was paid, including that part claimed by the plaintiff to be illegal, is a waiver of further tender. It is sufficient, under these circumstances, for the plaintiff to deposit the money in court when ordered by the court.

3. TAXES—*Illegal Levy—Injunction—Laches.* Under the statute which provides that, "An injunction may be granted to enjoin the illegal levy of any tax, charge or assessment, or the collection of any illegal tax, charge or assessment, or any proceeding to enforce the same," the taxes are a "charge" and an "assessment" upon the property of the plaintiffs, and a part of the "proceedings to enforce the same" is the issuance of the warrant to the sheriff, the issuance of such warrant is the duty of the treasurer, and is a "part of the proceeding to enforce the same," and an injunction will, therefore, lie against the county treasurer.

Gray, *et al.* v. Stiles, *Treasurer, et al.*

4. BOARD OF EQUALIZATION. Chapter 20, art. 7, "Territorial Board of Equalization," sec. 1, para. 5624, of the Statutes of Oklahoma, 1893, provides, that: "The governor, territorial auditor and secretary, shall constitute the territorial board of equalization, and said board of equalization shall hold a session at the capital of the Territory, commencing on the first Monday of July of each year; and, it shall be the duty of said board to examine the various county assessments and to equalize the same, and to decide upon the rate of territorial tax to be levied for the current year, together with any other general or special territorial taxes required by law to be levied, and to equalize the levy of such taxes throughout the Territory. And shall therefrom find the percentage that must be added to or deducted from the assessed value of each county, and shall then order the percentage so found to be added to or subtracted from the assessed values of each of the various counties of the Territory, and shall notify the various county clerks of the percentage so ordered to be added to or subtracted from the valuation of property in their respective counties. It shall then be the duty of the various county clerks to add to or deduct from the total value of the property assessed to each party the percentage so ordered and collect the taxes accordingly. Said board shall assess the rolling stock of railroads and all other property not otherwise provided for."

5. SAME—*Duties of.* It is the duty of the territorial board of equalization, under this statute, in order that the territorial and county taxes may be the same in all the local subdivisions, to reduce to the uniform basis the valuations made by the local assessors.

6. TAXATION—*Assessment—Equalization.* Assessment is the same as valuation of the property taxed. This assessment and valuation must be made by the officer or officers to whom it is by the statute expressly committed. The duty and function of assessment cannot be shared in by any officer to whom it is not so granted by the express language of the statute. Equalization of property is a wholly different matter, comprehending, as it does, simply the ascertainment of the average of the valuations already found. It is the equalizing of individuals among each other by the township boards, and of the townships among each other by the county boards, and of the counties among each other by the territorial board of equalization. It is, in the present case, the aggregate amount of property having been ascertained by the abstract of assessment rolls furnished to the auditor of the Territory from the various counties, an ascertainment of the proper percentage which should be added to some counties, and taken away from others, in order to place the counties upon an equal footing, the aggregate amount of property remaining the same, except from such slight raising or lowering of the amounts as may be incidental to the operation of equalization of the taxes among the various counties.

(Syllabus by the Court.)

*Error from the District Court of Logan County; before Frank Dale, District Judge.*

*Horace Speed*, for plaintiffs in error.

*Huston & Huston*, for defendants in error.

Injunction to restrain the collection of illegal taxes. Heard upon amended petition, answer and demurrer to the answer.

### STATEMENT OF THE CASE.

Complainants allege that they were the owners of real and personal property in Logan county upon which they had duly made returns for the year 1895 for taxes to the proper assessors for taxes within said county, and that the action of the township and city boards of equalization was proper; that the assessment for taxes was at a high rate of valuation, in many cases up to the full value of the property assessed; that after such assessments had been made and equalized by the county board of equalization for Logan county, the list of such assessments and equalization was sent to the territorial board of equalization as required by law; that the total valuation of such equalization and assessment, including all personal and real property in the county, and not including the railroad property and equipment, was not less than the fair, average amount and valuation which the property of Logan county bore to all the other property in the Territory; that at the same time like assessment lists were sent from each of the other counties in the Territory to the territorial board of equalization; that the aggregate of said assessments and valuations as sent

to the territorial board of equalization amounted approximately to the sum of twenty-eight millions of dollars; that the territorial board of equalization, upon receiving such assessments, made and ordered an increase of valuation on the proper assessment of each county of the Territory, except Kingfisher county, claiming that the property in each county, except Kingfisher county, was not fixed at its fair valuation; that the increase ordered in the different counties varied, according to the county, from 15 to 75 per cent.

They further alleged that the total valuation of the property of the Territory, as ascertained by the township assessors of the Territory and returned by the county clerks of the various counties to the auditor of the Territory to be acted upon by the territorial board of equalization, to-wit, the sum of twenty-eight millions of dollars, was, by the action of the territorial board of equalization, increased so as to make the total aggregate basis of taxation amount to the sum of thirty-nine millions, two hundred and seventy-nine thousand dollars; that the increase provided for the county of Logan under such action of the territorial board of equalization was put by the board at 45 per cent. of the assessment, as made and sent up by the county board of equalization; that the county clerk of Logan county, upon receiving a certificate of the territorial board of equalization, stating that such increase had been ordered, thereupon increased the valuation of each of the complainants upon both their personal and real property 45 per cent. and extended such increase upon the tax rolls of Logan county against the property of the complainants.

That said tax rolls were transmitted to the treasurer,

and the taxes so increased were by the treasurer extended upon his books and levied thereon against the property of the complainants; that said tax rolls and levies were both a lien and encumbrance upon the property of the complainants as shown by said books, and that the treasurer is now proposing to collect the whole of said assessment and levy, including the 45 per cent. increase aforesaid; that each of the petitioners has tendered the treasurer his taxes for said year less said 45 per cent., and the treasurer has refused to receive said sum unless the amount claimed by him as due under said levy of 45 per cent. is also paid; that he has notified the complainants that they need not make any further tender, that he will refuse the tender, and will not accept payment except of the whole tax or of the one-half of the said whole tax, including said 45 per cent.

That the said S. P. Atherton, N. H. Sturgis and W. R. Stapleton, as county commissioners, claim the right to require the treasurer to collect such tax and turn over the same for the benefit of Logan county; that the raising of the assessed valuation of the several counties of the Territory of Oklahoma, including the county of Logan, by the territorial board of equalization, was not for the purpose of equalizing the assessments of the several counties in the Territory, but for the purpose of increasing the said assessment, in order thereby to create a greater revenue. That the board of equalization had no authority in law to raise said assessments for such purpose, nor for any other purpose, the authority of the board over the assessment rolls of the several counties of the Territory, including Logan county, being limited by law to the act of equalization and equalizing the assessment

of all the counties in the Territory. The action of the board in raising the assessment of the county of Logan, as well as that of other counties in the Territory, is wholly without warrant of law and void.

That the indebtedness of the Territory and of the several counties of the Territory, and particularly of Logan county, had already reached, if they had not exceeded, the 4 per cent. limit prescribed by the laws of the United States and the laws of Oklahoma Territory, and further indebtedness of said Territory and of each of said counties and particularly Logan county, would be in violation of said laws; that to avoid the 4 per cent. limit upon the indebtedness of the Territory and of the counties, and in order to create further indebtedness of the Territory and of the counties, and to validate debts already incurred in violation of said statute, and above said 4 per cent. limit, the increase of 45 per cent was proposed, and by the board of equalization was determined upon, and its action in the premises was based upon these premises; that the making of the advance was for the purpose of evading the statutory limit of indebtedness.

That the assessment upon the personal property and real estate of Logan county was not upon the same basis of comparative value as the railroad property in the county, but that the railroad property was assessed at a much lower rate compared with its fair value, by the territorial board of equalization for the year 1896; that the railroad property was assessed at about 10 per cent. less than the assessment of railroad property the year before, which had been and then was and yet is a fair valuation, while the real estate and personal property was assessed at a much higher rate than it had been

assessed at the year before, which rate of the year 1894 was a fair valuation for each year; the fact being that the personal property and real estate of the individuals in the county had very much diminished in value after the assessment of 1894, and continued much depressed below the value of 1894 during all of the year 1895.

Wherefore the complainants said that upon their property they are charged and compelled to pay more taxes according to its value than is charged and assessed for collection upon the railroad property in the county according to its value, and that these facts were known to the board of equalization at the time they put the increase of 45 per cent. upon the property in the county; wherefore complainants said that such action of the board of equalization was unjust and contrary to law, and invalidated the assessment, and that such 45 per cent. increase should not be permitted; and the complainants said that in case this tax so levied is collected, including the 45 per cent., the damage to the plaintiffs, and each of them, will be great and irreparable, and that they have no adequate remedy at law, and prayed therefore for equitable relief by injunction.

That at the same time, to-wit, on the 17th day of June, 1895, when the territorial board of equalization increased the valuation of the property of Logan county and in the Territory, the board also, upon such increased valuation, fixed the rate of taxation for territorial purposes at the highest possible rate which the laws of the Territory would permit, and beyond the legal limit, without such increase, and under such new valuations, fixed the levy for the general territorial fund at three mills on the dollar of assessed valuation increased as aforesaid; the

Normal School fund levy at one-half mill on the dollar of assessed valuation increased as aforesaid, the University fund at one-half mill on the dollar of assessed valuation increased as aforesaid, and at the same time levied for territorial purposes a bond interest fund levy for one-half mill on the dollar of assessed valuation increased as aforesaid, which one-half mill levy, according to the estimated valuation would produce the sum of $20,000, when, in fact, the interest which such taxes could be applied would amount only to the sum of $4,800, and at the same time the board levied for the board of education fund a tax of one-tenth of one mill on the dollar of such valuation increased as aforesaid, making the total taxes levied by the board four and six-tenths mills on the dollar of valuation for territorial purposes. That such assessments and levy were in excess of the statutory limits and, therefore, invalid, and the last two assessments were without authority of law and, therefore, void.

That the object of the board, in increasing the valuation as aforesaid, was to evade the statutory limitation as to taxation and indebtedness, and to levy a larger tax upon the Territory than the law would permit under the valuations fixed by the proper officers of the law and equalized by the territorial board of equalization in the manner contemplated and required by law; and for the further purpose of enabling Logan county and other counties in the Territory to issue bonds and warrants for debts beyond the 4 per cent. limit prescribed by the act of congress under the lawful and right assessment, valuation and equalization by the proper officers under the law, and equalized as the law contemplated.

That under such valuation the counties, townships and other municipalities, including the townships and municpal corporations in which the property of the plaintiffs is located, have levied taxes and are proceeding to incur indebtedness above and beyond the amount which would be the limit under the law under the assessments and equalization of the proper assessors and boards of equalization of the townships, cities and county, equalized as the law contemplates.

And the complainants prayed the court thereupon that a temporary injunction be at once issued, and that at the hearing thereof, a writ should issue to perpetually enjoin the defendants, and each of them, from the levy or collection as against the plaintiffs, of any tax, charge or assessment for the year 1895, under said assessment and equalization, except for the same as found due by the board of equalization for the county of Logan, and to enjoin the treasurer from collecting as against them the 45 per cent. claimed to have been added to the assessment by the territorial board of equalization, and for all other proper and equitable relief.

The petition was verified.

A demurrer to the petition as amended was filed and counsel heard thereupon, and the demurrer overruled.

The defendants thereupon answered, denying every material allegation in the petition contained, except such as might be thereafter specifically admitted.

They further admitted that the plaintiffs are the owners of real and personal property in Logan county which was assessed and returned for taxation by the proper officers in the county for the year 1895, and that subsequent thereto the valuations of the property as equalized

by the various equalization boards of the townships or city and county wherein the plaintiffs reside. The defendants admitted that the territorial board of equalization of the Territory received the assessment lists from all the counties in the Territory, and in equalizing the valuations of property throughout the different counties in the Territory, increased the aggregate valuation of all the property in the Territory and increased the valuation of the real and personal property in Logan county 45 per cent. of the valuation fixed by the board of equalization of the county; that thereby the valuation of plaintiffs' property was increased 45 per cent. of the valuation fixed thereon by the county board of equalization.

The defendants admitted that in pursuance to this action by the territorial board of equalization and upon receiving a certificate from the territorial board stating the increase that had been ordered in said county, the county clerk of Logan county increased the valuation of the plaintiffs upon their real and personal property 45 per cent., and extended said valuation so as to increase it upon the tax roll of Logan county, and that after the rate of taxation had been fixed by the proper officers, the county clerk extended the same upon the tax roll of the county and transmitted the same to the treasurer of the county, and that the treasurer of the county is now collecting said taxes. That the tender was made as alleged, but that it was not continued or kept good by bringing the money into court. Defendants said that plaintiffs have slept on their rights and failed to take any proceedings to prevent the extension of all of said taxes upon the tax roll of said county, or to make any objections or protests thereto, and defendants said that

if the action of the territorial board in ordering the increase was irregular, it is too late now for the plaintiffs to be heard to complain. Defendants said that the rate of taxation in Logan county was fixed by the board of county commissioners subsequent to the action of the territorial board of equalization upon the basis of the increased valuation of the property in Logan county, as fixed by the territorial board of equalization, and that the board of county commissioners, at the time of fixing said rates, made a careful and conservative estimate of the expenses of the county for the current year 1895, and levied only a sufficient rate of taxation to meet the expenses; that the amount of money required to be paid as taxes for the county is no greater than as though said increase by the territorial board of equalization had not been made; that if said increase in valuation had not been made, the board of county commissioners would have been compelled to increase the rate of taxation, in order to meet the actual and necessary expenses of the county. The defendants further said that any interference by injunction or otherwise in the collection of taxes at this time would work a great and irreparable damage and mischief to the public interests; and that particularly an entire new tax roll would have to be prepared, and that the treasurer of the county would be wholly unable to determine the amount of taxes due from any individual so that the work in the treasurer's office in the county could not progress at all. That the cost of preparing new lists and new tax rolls and the extra help necessarily required in the treasurer's office would cost the tax payers of the county an amount of

30—

money largely in excess of any sum that plaintiffs would be entitled to retain had they moved in time.   Wherefore defendants prayed that this action be dismissed and that they have judgment for costs of suit.

To this answer the plaintiffs demurred, upon the ground that it did not contain facts sufficient to constitute a defense to the declarations of fact set forth in the petition. Upon the hearing, the plaintiffs' demurrer was overruled, the plaintiff thereupon electing to stand upon his petition and demurrer, and the case is thus brought here.

Opinion of the court by

McATEE, J: Since the demurrer of the plaintiffs admits as true the statements of fact contained in the defendants' answer, which are well plead, it is by the defendant contended that the the plaintiff had made no sufficient tender or averment of tender of the amount of taxes admitted to be due from them, and that they have, therefore, no standing in court and relief cannot be had here in the absence of such tender.

Section 5671 of the statutes of Oklahoma, 1893, declares that:

"Whenever any action or proceeding shall be commenced and maintained before any court or judge to prevent or restrain the collection of any tax or part thereof, or to recover any such tax previously paid, or to recover the possession or title of any property, real or personal, sold for taxes, or to invalidate or cancel any deed or grant thereof for taxes, or to restrain, prevent, recover or delay any payment of taxes, the true and just amount of taxes due upon such property or by such person, if in dispute, must be ascertained and paid before the judgment prayed for." * *

And sec. 4009 declares that:

"When a tender of money is alleged in any pleading it shall not be necessary to deposit the money in court when the pleading is filed, but it shall be sufficient if the money is deposited in court at trial, or when ordered by the court."

When, therefore, the petitioners, as averred in the petition, had "tendered the amount admitted to be due, less said 45 per cent.," and the defendant treasurer had "refused to receive the said sum unless the amount claimed as due under said levy of 45 per cent. is also paid, and that he had notified the defendants that they need not make any further tender and that he would refuse the tender, and would not accept payment except for the whole tax, or the one-half of the said whole tax, including said 45 per cent.," and this averment is not denied by the answer, but it is admitted therein that, "the tender was made as alleged," but that, "it was not kept good by bringing the money into court," no legal or equitable issue is proffered by the defendant on this subject, because the statute does not require any such payment on the "true and just amount of taxes due" except "before the judgment prayed for," and because, "when a tender of money is alleged in any pleading," it is "not necessary to deposit the money in court when the pleading is filed, but it shall be sufficient if the money is deposited in court at trial, or when ordered by the court."    No judgment has been entered as prayed for, nor has any order of the court been passed whereby it has become incumbent upon the plaintiff to make or aver any tender other or further than that which, as admitted by the pleadings, the treasurer has refused "to receive unless the amount claimed by him as due under said levy of 45 per cent. is also

paid." (*Chicago Ry. Co. v. Board Comm'rs.* [Kan.] 39 Pac. Rep. 1041; *Dorsey v. Barber,* 12 Amer. Decs. 296; *Loughborough v. McNevin,* 74 Cal. 250; *Kortright v. Cady,* 21 N. Y. 345-346.)

And the positive refusal of the treasurer to receive that part of the taxes admitted by the plaintiffs to be due, unless the whole was paid, including the part claimed to be illegal, is a waiver of further tender.' It is sufficient under these circumstances for the plaintiff to deposit the money in court, when ordered by the court. (*Dorsey v. Barber,* 12 Amer. Decs. 296; *Brewer v. Fleming,* 51 Penna. St. 102; *Lacy v. Wilson,* 24 Mich. 479.)

It is also argued that the plaintiffs in error are too late with their proceeding, that they are guilty of *laches,* that their proper resort would have been a writ of prohibition directed against the county clerk to prevent him from obeying the order of the territorial board of equalization, and it is also argued that the remedy be injunction here sought should have coupled the sheriff as a defendant, in as much as the actual seizure of the property under the tax levy and upon warrants for the collection of unpaid taxes would have been in his hands for execution, and that therefore the plaintiffs in error are both too late, in as much as they have not proceeded against the county clerk to prohibit him from extending the taxes upon the rolls, which extension made the taxes complained of a lien upon the plaintiffs' property, and too soon, in as much as the remedy by injunction as sought against the treasurer who is himself enforcing the payment of the taxes complained of in the manner of

an executive officer whose official duty and function it is to sell the land or property upon which taxes remain unpaid.

Neither contention can be sustained. The statute is not capable of misinterpretation. Its language is explicit, declaring, as it does in sec. 4143 of the Statutes of Oklahoma, 1893, that:

"An injunction may be granted to enjoin the illegal levy of any tax, charge or assessment, or the collection of any illegal tax, charge or assessment, or any proceeding to enforce the same."

When the taxes complained of were extended on the tax rolls of the county they became both a "charge" and an "assessment." Since it is the duty of the sheriff to collect the taxes of the county, and the statute prohibits in specific terms "the collection of any illegal tax, charge or assessment, or any proceeding to enforce the same," if the taxes complained of are illegal, and constitute, as they do, a "charge" and "assessment" upon the property of the plaintiffs, it is thus declared that such taxes may be enjoined on account of their illegality and because they are a charge and assessment, and if this is so, an injunction may lie against any officer in whose hands at the time the remedy by injunction is sought "the collection of the illegal taxes" is contemplated, or in whose hands the charge or assessment subsists. Not only so, but the treasurer himself failing to make the collection, the next step to be taken by him would be to issue his warrant to the sheriff undertaking to authorize the collection, and the issuance of such a warrant would be "a proceeding to enforce the same" and such proceeding may, in the express language of the statute, be enjoined, so that the

remedy of the plaintiffs is rightfully against any officer who participates in the illegal levy of any tax, charge or assessment or in the collection of any such tax or in any proceeding to enforce the same, and may, therefore, be against the treasurer, while the matter is in his control, just as it would be against the sheriff if the matter had passed into his hands, and the remedy sought is, therefore, neither too early nor too late. (*Cummings v. U. S. National Bank,* 101 U. S. 156.)

And the disposition of these questions brings us to the consideration of the case upon its merits, that is, as to the power of the territorial board of equalization under the statutes to raise the values placed upon all the property in the Territory by the legal assessors and to increase thereby the total amount of the assessable property in the Territory, while sitting as a territorial board of equalization, and upon this proposition the case comes on upon a petition for rehearing, and upon this proposition this court held, by a majority of its members in the case of *Wallace, et al. v. Bullen, et al.,* at the September, 1896, term of this court, in an elaborate opinion filed therein, that the territorial board of equalization had the power claimed for it by the defendants in error in this case, and thereupon determined this case also in accordance with those views. The judge who is now writing the opinion of the court upon the petition for rehearing in this case prepared and filed at the time an opinion dissenting from the views of the court, and will now proceed to discuss the question in accordance with the dissenting views then expressed, and substantially in the same terms.

To the statement of facts as they appear in the pleadings, it is but fair and necessary to the full comprehension of the issues involved in this case, of its origin, and to the far reaching importance of it, to add a fact not directly appearing in the pleadings or of record in this particular case, but appearing to the court in the record of the case of *J. M. Lee, County Treasurer, and Mott, McDowell and Meek, County Commissioners of Kingfisher County v. A. Mehew, et al.,* involving the right of the board of county commissioners, while sitting as a board of equalization, to raise the aggregate valuations returned to them upon the assessment rolls of the townships of that county, respectively, which was argued and submitted in connection with this case. The fact referred to is, that the board of county commissioners of Kingfisher county, sitting as a board of equalization, in 1895, undertook to determine the aggregate amount of property in Kingfisher county, by adding to the aggregate amount ascertained and returned by the various assessors of that county, to the county clerk of Kingfisher county, an additional amount, made up by adding to the aggregate valuation, 45 per cent. thereof. The increased sum, so ascertained, was forwarded by the clerk of Kingfisher county to the auditor of the Territory of Oklahoma, and constituted the amount which the territorial board of equalization acted upon, when it undertook to ascertain the aggregate amount of property in the Territory for the purposes of taxation. The valuation of property in Kingfisher county, as thus ascertained and returned by the board of equalization of that county, was the standard by which all the property in the Territory was by the territorial board estimated for the purposes of tax-

ation, and upon which action of that board was taken.

While, therefore, the result of the action of the board of equalization of the Territory was to raise the total valuation of the property in Logan county, for the purposes of taxation, 45 per cent., it did, in fact, act upon a standard of valuation ascertained by taking the aggregate values in Kingfisher county, which had already been raised 45 per cent. by the board of county commissioners of that county, and consequently adopting as a standard of valuation for the whole Territory the aggregate values as returned by the total sum of values as found by the various assessors of Kingfisher county and by adding thereto the increase of 45 per cent. made by the board of county commissioners of that county, and the additional increase of 45 per cent. made by the territorial board of equalization, or a total increase of 90 per cent. upon the amount ascertained by the assessors of Kingfisher county.

While the action of the territorial board of equalization in adding, by these means, as they did, to the aggregate amount of all property in the Territory of Oklahoma, as ascertained by the assessors, namely, twenty-eight millions of dollars, the additional sum of more than eleven millions of dollars, which raised the total valuation of property in the Territory of Oklahoma, for the purposes of taxation, to the sum of thirty-nine millions, two hundred and seventy-nine thousand dollars, the territorial board of equalization took for a starting point, not the aggregate amount of values returned by the assessors in any one county of the Territory, but a starting point which had already been inflated by the action of the board of county commissioners of Kingfisher county to the extent of 45 per cent. of the aggregate assessment and

valuation of that county made by the assessors thereof.

The result was, as is apparent, to raise the value, for the purposes of taxation, of all property in the Territory, not by the total sum of 45 per cent. upon the tax payers of Logan county and, indeed, upon the tax payers throughout the Territory, as fixed by the assessors, but to raise it in a much greater proportion, which there are no means of ascertaining by means of any figures or computations furnished to us in this case. The vast importance of the case to every tax payer in the Territory is thus apparent.

I have examined a multitude of cases from many states in the Union, involving the question now under consideration, but have in no case found any exercise or attempted exercise of jurisdiction sought to be exercised by state or territorial board of equalization, to be compared in magnitude with the jurisdiction sought to be exercised by such boards of equalization with the one now under consideration.

The proposition upon which this action is based and which has been sanctioned by the court is, that the territorial board of equalization is authorized and empowered, not only to "equalize" the aggregate values of property as returned from the various counties of the Territory and to bring them to a common standard or to establish a just relation between them, but that it may raise the aggregate valuation of all the property in the Territory. We cannot give assent to this proposition.

The different states of the Union have adopted systems of taxation and equalization, alike in their general features but unlike in their details. In some of the states the function of valuing is performed, not wholly

by local assessors who come in contact with the individual tax payer, receive his return of property and thus estimate its value, but by township boards to which their returns are made, and who co-operate with them or sit as boards of review and correction, with authority to make changes in values, but is shared also by the boards of county commissioners who are authorized to review and correct the returns of the local assessors and the township boards, and are charged with the duty of valuing as well as with the duty of equalizing values already ascertained. While in others still, the function and duty of valuing is confined to the township and city assessors, with appeal to the boards of equalization of the townships, respectively, who are authorized to finally value individual assessments. In this latter class, when the assessors have assessed the property of their respective townships or cities, and have returned their assessments to the township or city boards of equalization, and when the township and city boards of equalization and review have concluded their work, thenceforth the boards of county commissioners and state boards of equalization are charged with the function of equalizing, alone. The system established in this Territory belongs to the latter class.

It is provided in sec. 6 of the Organic Act of the Territory, that:

"All property subject to taxation shall be taxed in proportion to its value."[1]

And in the Statutes of Oklahoma, 1893, in sec. 6068, it is provided, that:

"The several township and city assessors shall meet at the county seat of their respective counties on the sec-

ond Monday of January, in each year, and agree upon an equalized cash basis of valuation of such property as they may be called upon to assess."

And in ch. 70, on revenue, of the Statutes, art. 2, it is provided, that:

"SECTION 5580. The territorial auditor, treasurer and attorney general shall provide for the use of the assessor * * blank forms for the listing and assessments of all property, and such instructions as shall be needful to secure full and uniform assessment returns."

And that the assessor should be furnished with them. Section 5583 of the Statutes provides, that:

"All taxable property, real and personal, shall be listed and assessed each year * * including all property owned on the first day of February on that year, and in case of stocks of goods, wares and merchandise, and the personal property of banks and banking institutions, including money, loans, discounts and credits, the statement shall include the average amount of the same for the preceding year ending on February 1. And in order to make the assessment, such assessor shall demand from each person and firm, and from the president, cashier, treasurer or managing agent of each corporation, association or company within his county, a statement, under oath or affirmation, of all the real estate within the county, and personal property owned by, claimed or in the use, possession or control of such person, firm, corporation, association or company, whether held by the party sworn, for himself or as agent for another, and shall set out in such sworn statement an itemized account of all classes of property, by this act defined as subject to assessment, by him so held or controlled."

In case of the failure of such person, etc., to give under "oath or affirmation" the statement required by this sec-

tion, the assessor shall ascertain and estimate the "amount, and cash value," and list the same accordingly.

It is further provided in sec. 5586, that:

"The assessor may place a different value on the property, if he is satisfied that the value so given is not correct; but in case he raise the assessment, he shall give to the person listing the same a copy of the schedule showing such increase; and the assessor shall seek to have assessed the same classes of property at a uniform value throughout the county."

It is provided in sec, 5587, that:

"The assessor shall take and subscribe an oath * * and attach it to the assessment roll * * swearing that the value of all property, moneys and credits, of which a statement has been made and verified by the oath of the person required to list the same, is hereby truly returned * * and that ,I have diligently and to the best means in my power endeavored to ascertain the true amount of value; and that, as I verily believe, the full value thereof is set forth in the above return."

It is provided in sec. 5588, that, "any person placing a false value thereon," upon such taxable property "shall be deemed guilty of perjury." ·

Section 5593 provides, that:

"An assessor who assesses property at less than its cash value shall be guilty of a misdemeanor and punished by a fine of not less than five hundred dollars and by imprisonment in the county jail for not less than three months, nor more than six months."

Aside from the provisions contained in art. 2, thus recited, sec. 5618 provides, that, "on or before the first Monday of May, annually, the several county or township assessors shall make out and deliver to the county clerks an assessment roll " * * together with "*the assessed value thereof.*"

Under art. 6, "County and Township Boards of Equalization," it is provided, secs. 5620-1, that:

"SECTION 5620. The township assessor, or township clerk, and township treasurer, shall compose the board of equalization for each township; the town or city assessor, mayor or president of the board of trustees, and the city clerk, shall compose the board of equalization for cities, towns and villages, and the said boards shall meet on the third Monday in April of each year to hear all complaints of persons who feel aggrieved by their assessments, and the decision of said boards shall be final as to individual assessments.

"SECTION 5621. The board of county commissioners of each county shall constitute a board, or a majority of the members thereof, shall hold a session of not less than two days at the county seat, commencing on the first Monday of June in each year, for the purpose of equalizing the assessment roll in their county, between the different townships."

Under art. 7, "Territorial Board of Equalization," sec. 5624, as amended by act of the legislature, approved March 8, 1895, it is provided, that:

"The governor, territorial auditor and secretary, shall constitute the territorial board of equalization, and said board of equalization shall hold a session at the capital of the Territory, commencing on the third Monday of June in each year; and it shall be the duty of said board to examine the various county assessments and to equalize the same, and to decide upon the rate of territorial tax to be levied for the current year, together with any other general or special territorial taxes required by the law to be levied, and to equalize the levy of such taxes throughout the Territory. And shall therefrom find the percentage that must be added to or deducted from the assessed value of each county, and shall then order the percentage so found, to be added to or subtracted from

the assessed values of each of the various counties in the Territory, and shall notify the various county clerks of the percentage so ordered to be added or to be subtracted from the valuation of property in their respective counties.

"It shall then be the duty of the various county clerks to add to or deduct from the total value of the property assessed to each party the percentage so ordered and collect the taxes accordingly. Said board shall assess the rolling stock of railroads and all other property not otherwise provided for."

These are the provisions made in the statutes of the Territory for the purpose of ascertaining the value of property in the Territory for the purpose of taxation. If the county commissioners authorized to equalize the assessment roll of their various counties, and if the territorial board of equalization have any authority to raise the aggregate amount of property in the Territory over and above the amounts returned to the auditor of the Territory in the assessment rolls by the county clerks of the various counties, that power must be found in the two sections last cited, secs. 5621 and 5624, as amended.

By sec. 5622 it is provided that the county clerk of the county shall be clerk of the board of equalization for the county; and by sec. 5623, that "as soon as practicable after the assessment rolls are equalized and corrected, as provided in the two preceding sections, and before the third Monday in June next ensuing, the county clerk shall make out an abstract thereof containing:" (Here follows a description of the different kinds of property.) "Which abstract the clerk is directed to transmit without delay to the auditor of the Territory, and the county commis-

sioners are authorized to direct the clerk to add to the above list of items such other items as they may deem advisable."

It will be seen from the recitation of the statutes, thus made, that it is not only provided by the Organic Act that "property subject to taxation shall be taxed in proportion to its value," but that an exact mode is prescribed by which that value shall be ascertained. The individual owner must, under the law, return "a sworn statement of an itemized account of all classes of his property, under oath."

The assessor is a local officer. He resides in the township or city where the tax payer and property are located; he is elected by the voters of the township; the purpose of the law, and the presumption is, that he is especially qualified to judge of and to estimate the value of property in his township; he is in a situation to be so informed. The law requires that, "he shall ascertain, and estimate from the best information that he can obtain, the amount and cash value of all the species of property required," and it is his duty "to seek to have assessed the same classes of property at a uniform value throughout the county." And before returning his assessment roll to the county clerk he must attach to it his oath, by which he has sworn "to ascertain the true amount of value and that he has returned the full value thereof, as set forth in the above returns."

If any person has wilfully returned under oath a "false list of his taxable property" or places "a false value thereon," he is deemed guilty of perjury, and a heavy penalty is imposed upon an assessor "who shall have assessed property at less than its cash value." To do that, is made

a criminal offense, punishable with fine and imprisonment. Values are thus ascertained, and no where in the statute can any provision be found by which the board of county commissioners or the territorial board of equalization, are charged with the duty, or in any way authorized or empowered, to assume the function of fixi g values or of raising the aggregate values on the assessment rolls as returned to the county clerk by the local assessors, unless such authority is found in secs. 5621 and 5624, above recited. Under the statutes of this Territory, quoted above, the duty and power of assessment and valuation cease with the assessor and the review of his work by the township board.

No means are provided to the board of county commissioners or to the territorial board of equalization, whereby values of property can be ascertained. When the local assessors, after discharging their duty, have made up their assessment rolls and returned them to the county clerks, they have, therefore, made out a *prima facie* case by which "the true cash value" has been ascertained, of all the property in their respective townships. The individual owner has returned and sworn to his property. The assessor has used the best local knowledge and information to ascertain and estimate the true cash value and has returned "the true amount of value," in his township and the "full value thereof" under oath.

Unless the board of county commissioners or the territorial board of equalization are authorized to call witnesses, and to take testimony, they can have no knowledge of the facts upon which to act, which would enable them to set aside the total sum of values thus ascertained. To undertake this jurisdiction the board sits for the dis-

charge of the function in a room in the capital city of the Territory, and without any information furnished to them by any method prescribed by law, undertake to say, without evidence, that the individual tax payers of the Territory have sworn falsely in making out their lists and returning them to the local assessors, and that the local assessors have individually and respectively sworn falsely in making out their returns. They have nothing before them upon which to act except an "abstract" of the "assessment rolls," which has been transmitted to the auditor of the Territory. That abstract forms the subject of their consideration. To such information as they are thus furnished with, they are compelled to confine their attention, in the absence of testimony which the statutes does not enable them to take, and they have thus assumed to say, upon their individual and uninformed judgments, that all of the assessors of the Territory, and that all of the tax payers in the Territory, have been mistaken and have sworn falsely, and that the property of the Territory has not been truly assessed, and that they, the board of equalization, by the statute authorized no farther than to "examine the various county assessments and to equalize the same and to decide upon the rate of territorial taxes to be levied for the current year, and to equalize the levy of such taxes throughout the Territory, and to find the percentage that shall be added to, or deducted from, the assessed value of such county, and to then order the percentage so found to be added to or subtracted from the assessed values of each of the various counties of the Territory," that they have the power and authority over the property and tax payers of the Territory, while there is thus no information given

to them upon which to act save the abstracts furnished to the auditor, and while thus uninformed, to say and to assume jurisdiction to determine what shall be the final and aggregate amount of property in the Territory, for the purposes of taxation.

It cannot be assumed that, because the power to raise the aggregate amount of property in the Territory is not denied to the territorial board of equalization, that the board therefore had the authority to .make such a raise and to participate in fixing the values of property in the Territory. It cannot be assumed that, because the board of equalization is a part of what may be, for the purposes of illustration, called the "machinery" of taxation, that, therefore, as a part of such "machinery" it may perform any function which may be committed to any other part of that "machinery." It cannot be assumed, in the presence of such testimony as is afforded by the values and lists of property returned under oath by the individual owner and tax payer, and in the presence of the sworn returns made by the assessors, and in the face of and against the returns made by the township boards of equalization, that the tax payer and the assessor have not succeeded in fixing the value of property at its true cash value. It cannot be assumed that, because the board of equalization has undertaken to state what is the true cash value of property in the Territory in the face of the evidence furnished to it by the "abstract of assessment rolls," that it has any authority or jurisdiction to ascertain what is the true cash value of the property of the Territory. While the figure of speech may be admitted for the purpose of imaginative description that the board of equalization is a part of the "machinery" of taxation,

it cannot be assumed in any wise correctly, that it is a constituent part of the "machinery" for fixing the valuation of property for the purpose of taxation. Nor can it be assumed that the territorial board of equalization can participate in the function of fixing the value of property in the Territory because it has not been expressly prohibited from doing so by the statute. That is not the rule, nor the mode of reasoning which I think this court should follow. I understand the rule to be, in a case like this, that no authority exists except that which is plainly provided for in the statute, or which must, by the necessities of reasonable inference, be deduced from the statute. The board of equalization has statutory and special jurisdiction alone, and that jurisdiction must be strictly pursued in conformity with the very terms of the statute in which it is given. It has no general jurisdiction. Nothing is presumed in its favor. And in a case of the kind before us, where a jurisdiction is attempted to be exercised to increase the amount of taxes which shall be taken from the citizen, the rule is emphatic and should not be transgressed. Whatever goes beyond this is invalid and without authority.

"It has been truly said that where the law gives a special jurisdiction to any body of men, it must be strictly pursued. Courts of justice are bound to watch their conduct narrowly and investigate it minutely. The peace of society and the security of property are intimately connected with and depend upon such inquiries. Can any man be safe in the tenure of his lands if they are liable, at the will and pleasure of county commissioners, to be sold through partiality or caprice, without treading in the path of their duty as sworn public officers?" (Black on Tax Titles, sec. 155; citing, Wister v. Kammerer, 2 Yeates 100.)

"The state board, like the county and district boards, is a mere creature of the statute, and can exercise no authority but such as the statute conferes." And one has within its sphere, the same power, and is limited by the same restrictions, as the other. (*Hamilton, auditor, v. The State,* 3 Ind. 456.)

"The board has whatever power is conferred by the statutes on that subject, and no other. The power which it possesses must be exercised in the mode prescribed by statute, and in no other. The mode in such cases is the measure of the power." (Desty on Taxation, 1241; citing, *Nickelson Pave Co. v. Painter,* 35 Cal. 699; Cooley on Taxation, 470.)

"The statute having specified what they, the board of equalization, might do, necessarily excludes every other power." (*Orr v. State Board of Equalization,* 28 Pac. Rep. 420.)

The principle is too well established to require or perhaps, even to permit, the citation of authorities. It applies as well to state or territorial boards of equalization as it does to those of the city or county. In the matter of taxation, the officer authorized must not exceed the specific terms of his authority. The law does guard, and the courts should guard with care and jealousy, the power which is exercised by any officer participating in the exercise of the powers of taxation. The power is exercised *ex parte.*

No opportunity is given the tax payer to be heard. The power is liable to great abuse, for it is exercised by those who are dealing with the property of others. No jurisdiction can be presumed to exist in the officer exercising the authority. He is strictly limited to the terms of the statute. The statute having specified what he may do, necessarily excludes every other power.

No matter how great or small the sphere of action of
a board of equalization may be, whether its scope is that
of the city, or the county or of the whole state, it is strict-
ly limited by the law as laid down in the statute.  If any
discrimination in such a matter were permissible, the law
would regard with a more jealous scrutiny the exercise
of jurisdiction by a board of equalization acting under
the statute than by one which acts only for a township
or other subdivision of the Territory.  And in as much
as the larger boards are more liable to attempt the exer-
cise of jurisdiction which does not exist in them, and in
as much as the injury resulting from their erroneous
action is more far reaching than in the case of similar
boards acting in a more limited sphere, the limitations
of the law should be applied to them with at least equal
watchfulness and care.

In the case before us, the territorial board of equaliza-
tion acts upon abstracts made from the assessment rolls
furnished to the auditor of the Territory by the county
clerks of the various counties.  These assessment rolls
contain the whole subject matter upon which it is pos-
sible for that board of equalization to act.  They contain,
being abstracts of the total assessment rolls, all which is
furnished, or appears to the board, of the aggregate
amount of property in the Territory.  Upon these assess-
ment rolls and the aggregate amount of property in the
Territory, as it appears from them, the board is, in the
language of the statute, sec. 5624, "to examine the various
county assessments and to equalize the same and to de-
cide upon the rate of territorial tax to be levied for the
current year, and with any other general or special terri-

torial taxes required by law to be levied," and "to equalize the levy of such taxes througout the Territory."

Is any authority here given to raise the amounts as they appear in the "various county assessments," and to raise the aggregate amount .of property in the Territory above the total sum as it appears in such assessments? If so the power must be drawn from those specifications and terms of the statute which denominate this board to be a board of equalization, and from the provisions that its purpose is, "to equalize the assessment rolls" and to "equalize the levy." The plain and patent meaning of the word "equalization," as here used is, to take the average of the assessments throughout all of the various counties, upon the aggregate amounts ascertained by the assessments, and to see, upon these rolls, that the counties, respectively, stand upon an equal footing. The power is a power to equalize the different assessments of values from the various counties constituting the aggregate amount of property in the Territory, and is not a power to raise the aggregate amount of all the property in the Territory. And so, similar statutes throughout the United States, wherever we have been able to find and examine them, have announced the same interpretation which is here given to this statute. This interpretation has been many times adopted. The section of the statute providing and thus limiting the jurisdiction of this board to that of "equalization" does, in its closing sentence, make plain the fact that no power was committed to this board to assess the valuation of the property in the Territory, for, under that closing sentence, the board was given the power to add to values of a particular class of property, for it was provided that the "said board shall

assess the rolling stock of railroads and all other property not otherwise provided for." And the legislature, in passing this act, did, therefore, as to all property included in the "abstracts of assessment rolls" furnished from the various counties by the county clerks thereof, give to the board the authority to equalize only, but gave to the board the power, with reference to the rolling stock of railroads and all other property not otherwise provided for, the power, and charged it with the duty, to "assess" them. And the uninformed judgment, unaided by other circumstances and considerations, upon the subject, would be, that in as much as the authority to "assess" was given to the board in one case specified, that it was excluded as to all other property with reference to which, the power was given to "equalize" only.

It was long ago declared by Mr. Justice Story, that:

"Statutes levying taxes or duties on subjects or citizens  *  *  are not to be extended by implication beyond the clear import of the language used, or to enlarge their operation so as to embrace matters not specifically pointed out, although standing on a close analogy." (*United States v. Wigglesworth*, 2 Story 369; Southerland on Statutory Construction, 361.)

The principle of interpretation here declared is sufficiently explicit, and is scarcely capable of being expressed in more peremptory terms. We understand it to have been the uniform rule followed by the courts. It excludes the power to value and assess property by a board, which is, in terms; only authorized to equalize assessments, or aggregates of value, and we must agree with its declaration for reasons founded upon safe principles of judicial construction, high authority and established precedent, sound policy and the true interest of the citizen and tax

payer, rather than consent to yield to that view which is here sought by the defendant in error and which was formerly held by the court upon the reasoning in *Wallace v. Bullen,* that the territorial board of equalization has the power to "value and assess" because that power is not excluded from the terms of the statute creating the board of equalization, and the express terms of which define its function to be those of equalizing alone.

The vast importance of the case; the extensive jurisdiction assumed by the territorial board of equalization over the property of the citizens of the Territory; the fact that this jurisdiction has been so exercised as to increase the aggregate amount of property in the Territory, as ascertained by the assessors, by the sum of more than eleven millions of dollars, after the summing up of the amounts contained in the assessment rolls from the various counties and the ascertainment of the aggregate amount of property in the Territory; the fact that this assumed jurisdiction is left by the opinion of the court without restraint and practically limitless; the fact that, if this jurisdiction goes unchallenged in the court, it will render nugatory that provision of the statute by which the legislature undertook to limit the authority to levy a certain number of mills upon each dollar of property in the Territory for the various purposes of government; and the fact that this jurisdiction was, in the case of *Wallace v. Bullen,* fortified in a carefully prepared and elaborately argued opinion there concurred in by a majority of the court, seem not only to justify but to demand, a careful consideration of the law, as we believe it to be, and as it has been repeatedly declared by the various courts of the country.

In the case of *Chamberlain v. The City of Cleveland*, decided by the supreme court of Ohio, in 34 Ohio State Reports, page 551, upon a statute which provided for the appointment of an "equalizing board" and that "the board, after taking an oath honestly and impartially to discharge their duties, shall hear and determine all objection to the assessment, and ·equalize the same; which equalized assessment they shall report to the council," the court said:

"These embrace all their duties—that is, the duties of the board of equalization—and it is apparent that they have no power to add to or deduct from the assessment to be equalized, except that they may, *ex necessitate*, as a part of the cost of the proceeding, properly add to the assessment a reasonable compensation to themselves for making the equalization. In adding over nine thousand dollars to the assessment, before equalizing it, the board of equalization acted wholly without authority, and their equalization was invalid and void, and, on this ground, the council ought to have set it aside."

It is declared by the supreme court of Iowa, in the case of *Royce v. Jennie*, that:

"The board of supervisors, as a board of equalization, has no authority to add property not assessed, to the assessment roll or tax list, or to strike property therefrom duly assessed, its duties being to equalize the value of property assessed by the proper officer."

In this case the county board of equalization had undertaken to add to the assessment of a private individual of the county 100 per centum upon the moneys and credits appearing in his assessment as returned by the assessor. Under the statute of that state "the township or city board of equalization" was charged with "the duty of equalizing the assessment of all tax payers in the township or city," and the supreme court held that:

"The county board of equalization is charged with the duty of equalizing the assessment of the townships and cities, not of the tax payers. This is done by adding to, or diminishing, the *valuation* of property, so that the property assessed throughout the county may be uniformly valued. (Code, 832, 833. [1879.] *Cassett v. Sherwood,* 42 Ia. 623.) It has no authority to add property not assessed to the assessment roll or tax list, or to strike property there from if duly assessed. Its duties are none other than to equalize the value of the property assessed by the proper officer." (*Royce v. Jennie,* 50 Ia. Repts. 679.)

In *Harney v. The Board of Supervisors of Mitchell County,* 44 Ia. 203, (1876,) the supreme court of that state again said:

"By sec. 832, the county supervisors are required to equalize the assessments of the several townships, cities and incorporated towns of their county in June of each year, substantially as the state board of equalization equalizes the assessments among the several counties.

"Section 834 requires the state board, on the second Monday in July, of each year, in which real property is assessed, to equalize the valuation of real property, which shall be done by adding to, or deducting from, the aggregate valuation of real property of the respective counties, the proper per centum to equalize them."

Upon this state of the law, the board of supervisors, acting as a board of equalization, made an order adding 20 per cent. to the valuation of all merchandise, moneys and credits in the towns of Osage and Mitchell.

The court thereupon held:

"After the assessments were made and returned the board believe that if any class in any town or township is valued too high or too low, they may add to, or deduct the proper per centum, and this we believe would be substantially the same manner as the state board are re-

quired to equalize, considering that the latter has no power to add to or deduct from the valuation of personal property."

In the case of *Kelly v. Corson*, 11 Wis. 2, the county board of supervisors, to equalize the valuation of real estate between the towns so as to provide a just relation between all the valuations of real estate in the county, undertook to assess the real estate in a "part of the town of Monroe" and to raise the valuation thereof, without raising the valuation of the other towns in the county.

The supreme court of that state said:

"The action of the county board in diminishing the valuation of a part of the town was unauthorized."

It was in the case of *Kittle v. Shervin*, by the supreme court of Nebraska, declared, vol. 11, 78, that:

"The city council, sitting as a board of equalization, had no power to raise the assessed value of all the property assessed in said city. Such raising of the valuation is not equalizing in any sense."

The case of the *The City of Indianapolis v. Sturdevant*, 24 Ind. 391, was a suit to recover taxes paid under pro⸱ and to prevent the sale by the treasurer of the property upon which the taxes were assessed, upon the ground that the property was used for educational purposes, and that by the statute of the state it was provided that such property should be exempt from taxation. Upon demurrer, the jurisdiction of the circuit court was challenged because the city charter provided for a board of equalization to pass upon all complaints with reference to the assessment roll, and that the original jurisdiction over the question resided exclusively in that board, and that the plaintiff was concluded since he failed to make application for relief before that tribunal.

The supreme court said:

"We cannot concur in this proposition. The power of the board of equalization seems to extend only to equalizing valuations made by the assessor, and no authority is given (to the board) to determine whether or not the property assessed is taxable."

In the case of *Oregon Steam Nav. Co. v. Wasco County*, 2 Oregon 206, the statute of that state provided that:

"The assessor, after qualifying, shall forthwith proceed and assess all the taxable property, and shall return to such county clerk, such assessment roll, with a full and complete assessment of such taxable property entered thereon, and said town lots and lands shall be valued at their cash value."

"Section 2.—All the personal property shall be valued at its value in cash."

Section 4 provided that the assessor should give three weeks public notice and then proceed to publicly examine the assessment rolls and correct all errors in valuation, etc., and made it the duty of persons interested to appear at the time for the purpose of having the proper alterations made.

The statute also provided, that:

"The county court of each county shall, at the September term, examine the assessment roll of its county, and shall have power to correct the same, make alterations in the descriptions. of lands, etc., upon such roll, etc., and make any other alterations or corrections in such roll as it shall deem necessary to make the same conform to the requirements of this chapter."

Upon this state of law, the assessor having filed the corrected assessment roll with the county clerk, at the October, 1866, term of the county court, did, under the advice and order of that court, change the valuations

on plaintiff's property, on the assessment roll from three hundred and forty-nine thousand, two hundred dollars, to five hundred thousand dollars. The taxes upon the difference between the two sums were paid under protest. The contention in the case was as to the extent and character of the jurisdiction of the county court over the assessment roll, after that roll had been returned by the assessor.

The court held:

"The assessor must * * make up his judgment of the value of the property; he is an officer of the county, and entrusted by his fellow citizens with this most important duty, for the reason as is presumed of his special fitness and capacity, and is supposed to properly care for the interests of the county; and his judgment of appraisal of value is a *judicial* act, and can only be called in question as provided by the statute, and in the absence of such provision is final. * * The only authority for revision in *valuation*, we deem, is vested in the assessor and clerk. * * In *Patten v. Green*, 13 Cal. 329, the full court says: 'We think it would be a dangerous precedent to hold that an absolute power resides in the supervisors to tax land as they may choose, without giving any notice to the owner. It is a power liable to great abuse. The general principles of law, applicable to such tribunals, oppose the exercise of any such power Any degree of strictness of procedure in these tribunals would be better than to give such arbitrary power to a board as would authorize it, without notice or evidence, or opportunity to the tax payer to heard, to increase his taxes indefinitely, without any right of appeal. We hold, therefore, that the action of the board is void in raising the tax.' This decision was made under a law *expressly* conferring the power upon the supervisors to 'correct any *valuation*, either by *adding* thereto or deducting therefrom.' * * In *People v. Reynolds*, 28 Cal. 113, upon a very similar

question with the one here, the supreme court says: 'No intendment is to be made in support of the acts of officers of inferior or limited jurisdictions, where it appears that such acts were not authorized.' Has there been found in any of the statutes of Oregon, above cited, a single inference indicating that an assessment may be increased? There is an express provision that it may be lessened, but not a word as to its increase. Acts without authority, done by such officers, are in the nature of things *coram non judice*, and void. In our state the tax payer, knowing his assessment and conscious that it cannot be increased, remains at home; and we fully concur with the two California decisions cited that without further notice, and without authority derived from law, an increase of valuation stands opposed not only to reason, justice and sound policy, but it is unlawful."    *    *

The court goes on to say, that in the code of the state, "the legislature provides fully as to the manner, time and rules for *affixing valuation* to property, and I find no such provision any where else; the officer, too, is clearly named whose sole duty it is to make that *appraisal*."

And it also provides for "changes in valuation;" but under the provision of the code giving to the county court its authority over the assessment roll, "change in valuation is not hinted at." The court has "power to correct the roll. That does not include the power to change assessments, for the words change and correct are not equivalent in meaning; it may change the descriptions of property."    *    *

"Evidently the power of the assessor ceases when, having completed the enumeration of assessments, he makes return of the roll and the same is filed in the county court."

"The assessment roll becomes a record subject only to statutory alterations."

"By ch. 2, if the assessor does not know he must inform himself of these facts, must swear the owner, make practical examination of the property, must distinguish between the value of articles of even the same species or class. How can the county court do all this?"

"The county court was undertaking to make the burden of taxation uniform on all persons, in strict proportion to the cash value of the property by each one owned, but we think the court did not have the authority necessary to increase the assessment."

Liberal extracts are here introduced from the opinion of the court in this case, because it especially distinguishes the functions of assessment and equalization, and shows what the law must, from the necessity of the case, be as to the fixing of values for the purpose of taxation. When the function of valuation has been committed to particular appraisers or assessors, by fit terms of the statute, and when no power is expressly given by the statute to change these values, they are final and must remain as they are and can only be the subject of alteration under express and well defined statutory provisions, and no change in assessments can be made that will be legal which is not made upon notice, and that the act of raising valuations cannot be performed by a county court, board of supervisors or territorial board of equalization, when such board or boards have no means of information, and are without authority expressly given.

An instructive case upon the question is that of *Wells, Fargo & Co. v. State Board of Equalization,* decided in the supreme court of California, and reported in 56 Cal. Repts. 194. The case was presented upon a writ of pro-

hibition against the state board of equalization to prevent the board from raising the assessment upon the property of the petitioner.

Section 9, art. 8, of the constitution of that state, provides:

"A state board of equalization  *  *  shall be elected *  *  whose duty it shall be to equalize the valuation of the taxable property of the several counties in the state for the purposes of taxation.  *  *  The boards of supervisors of the several counties in the state shall constitute boards of equalization for their respective counties, whose duty it shall be to equalize the valuation of the taxable property in the county for the purpose of taxation; *provided,* such state and county boards of equalization are hereby authorized and empowered, under such rules of notice as the boards may prescribe, as to the county assessments, and under such rules of notice as the state board may prescribe, as to the action of the state board, to increase or lower the entire assessment roll, or any assessment contained therein, so as to equalize the assessment of the property contained in said assessment roll, and make the assessment conform to the true value in money of the property contained in said roll."

This provision of the California constitution should be compared with the terms of our own statute creating the territorial board of equalization and declaring its duties. For all the purposes of the decision upon the point in question our statute is identical with the provisions passed upon in that case. But the supreme court of California, upon the matter, said:

"On the part of the state board of equalization, it is contended, that by virtue of this section they have the power to increase or lower any and every individual assessment in each and every county assessment roll within the limits of the state; and that, too, irrespective

of any action on the part of the county boards of equalization in respect to individual assessment upon the rolls of their respective counties.

"If the state board has such power, it is unquestionably a tremendous power.  *  *

"That such a power may readily lead to great abuses, does not admit of doubt. Such considerations, however, afford no reason for denying the power, if it does exist. They should only make us cautious in considering the question, which recurs, and is, what is the true and fair construction of the provision already quoted? Its meaning, when ascertained, we are bound to give effect to, whatever the consequences.

"In the first place, the section in question provides for a state board of equalization, and also for county boards of equalization. They are all boards of *equalization*. To equalize is to make equal, to cause to correspond, or be like in amount or degree, as compared with something. The meaning of the term is important to be borne in mind.

"Reading the proviso as it is claimed on behalf of the state board it should be read, that board is authorized and empowered 'to increase or lower the entire assessment roll, or any assessment contained therein,' and exactly the same power is conferred on the county boards in respect to the rolls of their respective counties.

"For many reasons, it is manifest the proviso should not be so read. To do so would not only lead to the most glaring absurdities and serious conflicts between the respective boards, but would make the proviso inconsistent with the body of the section, and contrary to the fundamental idea of equalization.  *  *

"It was, therefore, eminently wise on the part of the framers of the constitution to limit the powers of the state board in respect to equalization, as we think they did do by the section under consideration, to the equalization of the assessment rolls of the various counties by comparing the assessment roll of each one of the counties

with the roll of each and all the others, and thus make the assessment conform to the true value in money of the property contained in the respective rolls.  * *  Thus each board becomes what the provision treats of—a board of *equalization."*

And the constitution of California having, therefore, expressly provided that, under such rules of notice as the state board may prescribe, it "may increase or lower the entire assessment roll, or any assessment contained therein," so as to "make the assessment conform to the true value in money of the property contained in said roll," its supreme court held that the boards having been constituted upon the theory and for the purposes of "equalization," that they could not increase or lower the entire assessment roll, and that the provision thus made was but an obscurity, to be disregarded in the presence of the duty with which alone the equalization board was charged, namely, the duty of "equalization."

In the case of the *People, ex rel. Crawford v. Lathrop,* 3 Col. 428, the supreme court of Colorado has given the question somewhat fuller consideration, and upon a similar statute arrives in unmistakable terms at the same uniform result as that which is indicated by all the cases which we have been able to find, except that of a majority of this court in the case of *Wallace v. Bullen.*

And yet it is concluded by this court, in the case of *Wallace v. Bullen,* that:

"It is not necessary that we should dissent from the reasoning and conclusion of the learned court in that case, in order to arrive at a different result in the case which we are now considering."

The constitution of Colorado provides for the election of a county assessor in each county. The statutes of the state, pursuing the consitutional direction, provide for the election of this county assessor. The county commissioners of each county are constituted, by the statutes, a board of equalization for the correction and completion of the assessment roll, with power to supply omissions in the assesment rolls, and for the purpose of equalizing the same, to increase, diminish or otherwise alter and correct any assessment or valuation. It provides, in case of a change of the assessment of any taxpayer, that he shall be notified and have a hearing before the board. It constitutes a *quasi* court to hear any and all complaints of the taxpayer touching the valuation or listing of his property, with power to adjust and correct the assessment roll as they may deem proper and right, thus adding statutory duties to their constitutional duties; "to adjust and equalize."

And it was contended by the court here in *Wallace v. Bullen*, that the difference in the constitutional and statutory provisions of the state of Colorado, upon this point, so differentiate the Colorado case, as to make the conclusions of the court there inapplicable here. By the court here it was, in *Wallace v. Bullen*, argued that, inasmuch as the statute of Colorado provided an appeal to the board of county commissioners and gave to that board authority to participate in the duty and power of assessing and fixing values, that, on that account, it was unnecssary that the board of equalization of the state of Colorado should have or assume this assessorial power, but that, inasmuch as the boards of county commissioners of this Territory are not clothed with any authority to join in the assessment of values such as was, as it is claimed, given

to the boards of county commissioners in the state of Colorado, that, therefore, this authority to complete the assessment and valuation of property after the local assessors have finished their work, must, by implication, exist in the territorial board of equalization of the Territory, and that inasmuch as the property, for the purposes of taxation, must be assessed at its true cash value, that, therefore, the territorial board of equalization has this power also, that is, to see that the property of the Territory is assessed at its true cash value, and that it is the duty of that board to examine, and if it finds that this has not been done by the local assessors, that they have, therefore, the authority to review the whole assessment rolls, showing the aggregate amount of property resulting from the local assessment and to fix "the true cash value" of property in the Territory.

I cannot concur in the slightest degree in these conclusions. Unlike the method of assessment adopted in Colorado, our system provides, as has been seen, for assessment by local assessors, with statutory provisions for the equalization of individual assessments by the boards of equalization of each township, and upon the conclusion of its work by the last named board, that the assessments shall be final as to individual assessments. The duty and power of making assessments or valuation ends with the local assessors and the township board of equalization. With us the board of county commissioners is given the power to adjust and equalize. The board of territorial equalization is charged with the same function, and no other. The two last named boards have nothing to do with the "true cash value" of property in the Territory. It is their duty, respectively, to adjust and equalize be-

tween the different townships in a county, and between
the different counties in the Territory, the aggregate
amount of property, as ascertained by the assessment
rolls of the respective townships within the county and
the assessment rolls of the counties, respectively, fur-
nished to the auditor of the Territory by the county clerks
of the various counties.

It was held in the opinion of the court, in *Wallace v.
Bullen*, that:

"That honest and uniform valuation which the law ex-
pressly demands is its assessment and valuation at its
true cash value. The board of equalization found on ex-
amination that the property in Kingfisher county had
been honestly assessed and returned at its true cash
value. They further found that in every other county in
the Territory property had been assessed and returned
with values fixed at from 5 to 75 per cent. below the true
cash value, and they ordered that percentage to be added
to the returned valuation of each of the counties, except
Kingfisher, that would make the assessment represent
the true value, and thus equalize the valuation of all the
counties upon the basis of the requirement of the law."

I dissent from this statement of fact. The board is
furnished with no means of ascertaining whether prop-
erty in the various counties had been honestly assessed or
not. It had no means of determining that property in
Kingfisher county had been honestly assessed or
not. Nor had any method of ascertaining that in every
other county in the Territory property had been dishon-
estly assessed.

The statutes furnish them with no method of procuring
information upon these points, nor do they furnish the
board with the legal authority to make the inquiry. If
the board had been so furnished they would have found

that the valuation in Kingfisher county had already been raised 45 per cent. by the board of county commissioners, upon the assessments of that county, as returned by the township assessors, under an assumption of authority which we believe to have been of a similar character, and only less in geographical extent, than that assumption of authority by the territorial board of equalization which we are now considering. And I dissent from the conclusion that the "equalization" thus effected was in any sense the equalization intended by the statute, which is nothing more than taking the average of all the county assessment rolls, and thus ascertaining the percentage which should be added to or deducted from the assessment rolls of the various counties in order to equalize them with one another. No power exercised upon inference can be justified when the power of taxation is to be exercised, by which the property of the citizen can be taken away from him.

And the supreme court of Colorado properly declared, that:

"A power so vast and important, involving the integrity of constitutional limitation, cannot be founded on an implication of law. A statute in derogation of the rights of property, or which takes away the estate of the citizen, must be strictly construed." (*Sharp v. Spier*, 4 Hill 76; *Bloom v. Burdick*, 1 Hill 130; *People v. Lathrop*, 3 Colo. 467.)

I do not understand the court, in its opinion, to cite any case as authority for its conclusion, other than that of *Black v. McGonigle*, 103 Mo. 78.

The revised statutes of Missouri, 1879, sec. 6672, provided that the board of county commissioners, sitting as as a board of equalization, should not only "equalize the

valuation and assessment of all such property, both real
and personal," but should do so in such a manner that
"each tract of land shall be entered on the tax book at its
true value."

Upon this provision of the statute the court held in
that case, that:

"In such a case it is not necessary to specify each par-
cel of land thus increased. It is sufficient to increase the
assessed values of all the lands in a particular township
by one order."

This opinion was rendered, as is stated in the opinion
of the court in *Wallace v. Bullen,* "without support of
authorities." While it may be correct upon the Missouri
statute, I do not consider it of force as illustrating or in-
terpreting ours, since the county board of equalization in
that case was especially charged with the function of re-
viewing and fixing values, not given in the statute of this
Territory, to the territorial board of equalization, and
was a statutory authority given in addition to the func-
tion of equalization, inasmuch as it was expressely
charged with the duty of seeing that "each tract of land
shall be entered on the tax book at its true value."

It does not support the conclusion of law sought to be
drawn from it.

But the proposition now here asserted has been dis-
tinctly upheld in that state in the case of *Paul v. Pacific
R. R. Co.,* 4 Dill. Circuit Ct. Repts. 35, in the United
States circuit court for the Eastern district of Missouri,
in an opinion announced by Dillon, circuit judge.

The statutes of the state of Missouri required each
railroad company to make a list of its property, and to
affix a value to it. These lists were transmitted to the
counties, and there was a county board established,

whose duty it was "to examine the statement furnished them by the officer of the company, and to determine the correctness thereof, as to the amount of property and the *valuation* thereof." The companies complied with this provision, and transmitted their descriptive lists and valuation to the various counties. The valuation of the railroad property in Pettis county, as returned by the officers of the company, amounted to three hundred thousand, two hundred and sixty dollars, but as increased by the county court it amounted to five hundred thousand dollars. Another provision of the law is that this valuation, as fixed by the county court, shall be transmitted to the state board of equalization; that board consisted of the state senate.

The statute provides that the "state board shall proceed to adjust and equalize the aggregate valuation of the property of each one of the railroad companies, liable to taxation, under the provisions of this act." And without authority the state board of equalization undertook to raise the property of the railroad companies from nine thousand dollars a mile to twenty-six thousand dollars a mile.

The opinion of the court, in which Mr. Justice Miller, of the supreme court of the United States, and United States District Judge Treat, participated, declared that "the law limited the functions and powers of this body to the work of equalizing," and that the raising of the valuation of the railroad company amounted to an assumption of the functions and powers of an original assessment, which did not exist in this board, but that its functions and powers were those of "adjustment and equalization of valuations alone."

And after my dissenting opinion was filed in the case of *Wallace v. Bullen*, and on the 28th day of September, 1896, the views here expressed were again declared by the supreme court of Montana in the case of *State, ex rel. Wallace v. State Board of Equalization*, 46 Pac. Rep. 266.

The constitution of Montana provides, sec. 15, art. 12, that:

"The governor, secretary of state, state treasurer, state auditor and attorney general shall constitute a state board of equalization, and the board of county commissioners of each county shall constitute a county board of equalization. The duty of the state board of equalization shall be to adjust and equalize the valuation of taxable property among the several counties of the state. The duty of the county boards of equalization shall be to adjust and equalize the valuation of taxable property within their respective counties. Each board shall also perform such other duties as may be prescribed by law."

Acting under this provision, the state board of equalization undertook to and did increase the aggregate total of all the values of property in the several counties of the state from the sum of one hundred and eleven millions and eighty-four thousand, three hundred and fifty dollars, which was the total value of property as disclosed by the abstracts of assessment rolls and statements transmitted to and received by the state board from the county boards of equalization and assessors, to the sum of one hundred and fourteen millions, two hundred and thirty-one thousand, seven hundred and two dollars, which was an aggregate increase of the total assessed valuation of all the property in the several counties of the state, as shown above, of three millions, one hundred and forty-seven thousand, three hundred and seventy dollars.

The supreme court of the state held the increase to be void, saying that: "The state board of equalization was without power to increase proportionately the valuation of the property in the several counties of the state, and thereby increase the aggregate value."

My understanding of the authorities of the supreme court of the various states, as thus recited, is confirmed by the interpretation placed upon them by the text writers.

It is said in Desty on Taxation, vol. 1, page 498, that:

"Boards of equalization cannot act unless specially authorized. Their jurisdiction is special and limited, and must be conferred in express terms. * * The valuation of the assessors is conclusive, except when otherwise provided by statute. When the question of valuation has been once regularly referred to the proper board, the valuation of that tribunal is final."

And on page 496 that "the powers of such board are limited to securing uniformity between the several assessorial districts."

And on page 505:

"It is the duty of the state board to adjust and equalize the valuation of the real and personal property among the several counties, with the view of apportioning equitably the burden of the state government. * * Although the power to determine the valuation of taxable property is lodged in the assessors and boards of county commissioners, yet the state board of equalization may, for the purpose of adjusting and equalizing, increase the aggregate valuation of one county and decrease that of another, but it has no power to increase the aggregate valuation above the valuations as returned by the clerks of the several counties."

And it is said, in Burroughs on Taxation, page 235, that:

"The functions of these boards is two-fold.   They are sometimes invested with the powers of boards of review in addition to other powers, but when not invested with such powers their duty is to equalize the assessment of each county so that all the towns of the county may bear the burden of taxation equally, or to equalize the assessment of the counties so that each county may bear its proper proportion of the burden.   In the latter case it is called 'State Board of Equalization.' "

And it is said in the text of American & English Encyclopedia of Law, page 247, that :

"The duty of boards of equalization is to adjust and equalize the valuation of property among the several districts, with a view of an equitable apportionment of the burden, and for this purpose they may increase the aggregate valuation of one district and decrease that of another,   *   *   but they cannot increase the sum of all the valuations of the several districts."

The law as thus uniformly declared, not more explicitly by the supreme courts of the various states, and in the various text books which treat of the subject, than in the interpretation of the statute by the natural reason unaided by such authoritative exposition, has found its way into the lexicography of the language and "equalization" in the law is defined in the Century dictionary, as:

"Board of equalization, in the state or county governments of some of the United States, a board of commissioners whose duty it is, in order that the incidence of state or county taxation may be the same in all the local subdivisions, to reduce to a uniform basis, the valuation made by the local assessors."

We have thus examined and stated, not only all the cases bearing upon the question which were presented to the court in the briefs of counsel, but many others, and have, in the course of our examination, been unable to

find a single case which has undertaken to construe a statute similar to that now under consideration in any other way than as limiting the powers of the board of equalization, having only an abstract of assessment rolls before them for consideration, to the power of equalization alone, and we conclude that any attempt on the part of such a board to increase the aggregate amount of taxation, ·was an unauthorized assumption of authority to assess and fix values which does not exist under a statute of that character.

The opinion of the court in *Wallace v. Bullen* is sought to be fortified by the consideration that indebtedness has been incurred, and bonds issued in good faith, in reliance upon the validity of the increase made by the territorial board of equalization to the aggregate amount of property in the Territory for the purposes of taxation.

The inference is, that the finding of the court ought to support the jurisdiction of the territorial board of equalization thus assumed to secure the payment of such indebtedness. And it is said in the opinion of the court in that case, that:

"This court having regard for public honor, faith and credit, cannot consent that the ordinary and common rule for construing a public statute shall be violated or strained, and clearly expressed legislative intent be disregarded when such departure from established rules of interpretation would clearly result in the violation of private rights, and the impairment of public faith, and might seriously impair the usefulness of territorial, county and municipal governments by depriving them of the just revenue necessary for a proper discharge of their functions."

If we could agree with this mode of reasoning and with the declarations that a statute prescribing the procedure

for taxation was to be construed to include the exercise
of a specific power, because the exercise of that power is
not prohibited, and that a plain legislative intent is mani-
fested authorizing the board to assess and value, when it
is authorized in express terms only to "equalize," we
might also conclude that in assuming the functions of
assessment and the power to value the property in the
Territory, and in setting down that aggregate value at
thirty-nine millions, two hundred and seventy-nine thou-
sand dollars, instead of twenty-eight millions, ascer-
tained by the assessors of the Territory, the territorial
board of equalization was taking its course plainly and
directly in the broad highway of the law, with its sails
full of jurisdiction, but we declare our belief to be that
the well known and established rule for construing the
public statutes in question, has been disregarded by the
territorial board of equalization, and that a power has
been assumed by it which is clearly outside of the statute,
which is the sole source and foundation of its authority,
and which does not exist in that body, and that, in order
to sustain that jurisdiction, a construction must be ap-
plied to the statute which strains and warps it from that
clear meaning which all of the courts have hitherto at-
tributed to similar statutes expressed in like language.

The limitation of the federal statute referred to is that
of July 30, 1886, which provides, that:

"No political or municipal corporation, county or other
subdivision in any of the territories of the United States
shall ever become indebted in any manner or for any pur-
pose to any amount in the aggregate, including existing
indebtedness, exceeding 4 per centum on the value of the
taxable property within such corporation, county or sub
division, to be ascertained by the last assessment for ter-

ritorial and county taxes previous to the incurring of such indebtedness; and all bonds or obligations in excess of such amount given by such corporation shall be void." (Supplement to Revised Statutes of U. S., vol. 1, page 504.)

This federal statute speaks for itself.  It is a protection, and was intended as a protection, to the taxpayers of the territories of the United States.  By various arguments in several cases heretofore argued to this court and before the several district courts of the Territory, its force and effect have been, prior to the action of the territorial board of equalization here complained of, sought to be set aside by those who hold warrants issued in excess of the 4 per 'cent. limit, specified in the act.  This court, and the district courts of the Territory, have uniformly held that the municipalities are limited in their power to incur indebtedness by the terms of this act. Since it was intended by the holders of such indebtedness, incurred beyond the 4 per cent. limit and hitherto held to be illegal, to adopt some other method of securing payment, than by any further direct application to the courts, a plausible ingenuity suggested the direct application to some board of county commissioners of the Territory, as was in this case, made to the board of county commissioners of Kingfisher county, to assume jurisdiction and inflate the aggregate values of property in the  county, by an  addition  of  45  per cent. to the assessment and valuation of that which had already theretofore been ascertained by the legal method prescribed in the statute, and a subsequent application to the territorial board of equalization to further inflate the aggregate valuation of all property in the Territory to an average addition of 35 per cent.  Is it too much to

assert that this is just what occurred in this case? Or would such an assumption be going beyond the proper limits of a judicial opinion? A vast amount of illegal warrants were current in the Territory before the action referred to was taken by the board of county commissioners of Kingfisher county, and by the board of equalization for the Territory, and still subsist. The existence of such a sum of illegal indebtedness furnished a fertile field for investment and speculation, and a large quantity of such illegal warrants, issued in excess of the 4 per cent. limit having become finally located in the hands of a comparatively few persons, the incentive became active and vigilant to secure, not the small amount of percentage which had been originally paid upon the purchase of and for the assignment of these illegal warrants and indebtedness, but to secure the payment of them for their face value, and since the adventurer in this line of industry had failed to secure the co-operation of the courts in the attempted abrogation of the federal statute limiting the indebtedness of municipalities to 4 per cent. of their last assessed valuation, no device remained except that of widening the basis of taxation by the successive illegal and unauthorized over-valuations which were made in this case. If successful, and if the supreme court could now be induced to consummate the scheme and complete and crown its success by an affirmation of this court, the federal statute of limitation would be completely evaded, and the tax paying citizens of the Territory loaded with an indebtedness not theirs to carry, under the laws.

If, indeed, the illegal and fraudulent addition of eleven millions of dollars to the value of property for taxation,

by the action thus taken, be made the subject of taxation and further indebtedness, then, by the means of the indebtedness on behalf of the counties respectively, up to the 4 per cent. limitation, and of the townships respectively up to the 4 per cent. limitation, and of the school districts respectively, up to the 4 per cent. limitation, and of the Territory itself up to the limitation of 1 per cent., then the speculators, who are back of the illegal assessment thus made by the territorial board here sought to be upheld, would have been successful in saddling upon the taxpayers of the Territory, by means of the board of county commissioners of Kingfisher county and the territorial board of equalization, an added annual tax of 13 per cent. upon such addition to the aggregate valuation of the whole Territory, to-wit, upon eleven millions of dollars; in other words, it would have been made possible to collect from the tax paying citizens of this Territory $1,500,000 of illegal taxes, a large part of which illegal indebtedness was undoubtedly held in warrants by those who devised this gigantic and nefarious scheme of robbery.

We cannot understand how the defeat of such a scheme could "result in the violation of private rights, and the impairment of public faith, or might seriously impair the usefulness of territorial, county and municipal governments by depriving them of their just revenue."

To accede to such a proposition would be to hopelessly mingle with the high duty of this court, to interpret the laws as they are, regarding such simple interpretation as the surest and safest foundation of the integrity of the state, with the corrupt schemes of those who would de-

stroy the citizenship of the Territory by loading them with obligations in violation of the statute and not honestly theirs to carry or to pay.

I think that the courts best discharge their duty, and are held in the highest esteem, and reach their highest usefulness, when they confine themselves most carefully to the duty of interpreting and stating the law as it is; and when we, as judges, do that, we can safely rely upon the "public honor, faith and credit" of this Territory, and the honor of this court taking care of themselves.

We conclude, that assessment is the same as valuation of the property taxed; that this assessment or valuation must be made by the officer or officers to whom it is by the statute expressly committed; that the duty and function of assessment cannot be shared in by any officer to whom it is not so granted by the very language of the statute; that equalization of property is a wholly different matter, comprehending, as it does, simply an ascertainment of the average between valuations already found. It is the equalizing of individuals among each other by the township boards, and of the townships among each other by the county boards, and of the counties among each other by the state board of equalization. It is, in the present case, the aggregate amount of property having been ascertained by the abstract of assessment rolls furnished to the auditor of the Territory from the various counties, an ascertainment of the proper percentage which should be added to some counties and taken away from others, in order to place the counties upon an equal footing, the aggregate amount of property remaining the same, except from such slight raising or lowering of the amounts as may be incidental to the operation of equalizing of the

33—

taxes among the various counties, and that if the assumption of such authority and its sanction by the court here be indeed the law, then it would make very little difference whether there be any limitation in the statute of 1, 2 or 10 mills in the levy to be made by the territorial board, and the boards of county commissioners in the'r respective counties, for, if they be restrained in the statute in one place and set free by inference to increase the aggregate amount of property in the Territory, the extent to which that power might be exercised would be a mere matter of private opinion among the members of the board and of helpless conjecture on the part of the taxpayer, and we therefore, believe that the board of equalization exceeded any power given to it by the statute in making the equalization complained of, and that, to the extent of such addition to the aggregate amount of property in the Territory as was made by the territorial board of equalization—being 45 per cent. in Logan county in addition to the values of a county already over-valued 45 per cent. by its own board of county commissioners—the taxes levied upon the petitioners were void.

The order of the district court is reversed.

Dale, C. J., having presided in the court below, not sitting; Bierer, J., and Keaton, J., concurring; Tarsney, J., dissenting.

Specially concurring opinion by

BIERER, J.: Realizing the great importance of this question, it being one which affects every tax payer in the Territory, as the legal assessments as approved by the township boards of equalization and returned to the county clerks have been, in every instance, raised, I feel it my duty to enter an affirmative, rather than a pas-

sive approval of the conclusions which have been reached, and which are so ably presented in the foregoing decision of my associate, Justice McAtee. The conclusion of the court in this case overrules the former conclusions of the court in *Wallace v. Bullen,* decided at the June, 1896, term of this court, and as that case was an appeal from my decision in the trial court, I could not express my views upon the questions involved. But, as the former opinion in this case followed that, I did in this case dissent from the conclusions reached in the case of *Wallace v. Bullen,* and my dissenting opinion, then rendered in this case, is now, very agreeable to myself at least, changed into a concurring opinion.

I agree fully with the conclusions of Justice McAtee, and his opinion reviews the question so fully and extensively that I will be content with perhaps but an emphasis of one or two of the more important phases of the question, and a review of a few cases on the subject, and a limited number of additional citations from the text-writers.

The sections of the statute which are pertinent to this question are all set out in the opinions already rendered, and it will be unnecessary for me to repeat them here, but it will be sufficient for me to state my conclusions of what the law is from them.

The territorial board of equalization is clothed purely and solely with the power of *equalization* of *assessments* and not with the power to change *valuations.* It must take the valuations as returned by the county clerks, and has, in my judgment, no power whatever to change such valuations. So far as the territorial board of equalization is concerned, it makes no difference whether the

assessments have been made, as they should be made, at the actual cash value of the property, or whether they have been made upon a basis greater or less than that. The statute makes it the board's duty "to examine the various county assessments and to equalize the same." The terms of this language is the sum total of its power with reference to equalization. It is to examine the county assesments. It has no power to examine anything else, nor to hear anything else, nor to review anything else, nor to decide from any other matter presented than the county assessments, and it must then equalize, and not re-assess, the same.

The statute is most complete and comprehensive in defining the mode and manner of making the assessments. The individual must give in his property under oath, and the assessing officer must also swear to the correctness of the valuations. The territorial board of equalization does not have the responsibility of determining the correctness of the valuations of the property. It hears nobody's statement under oath, and makes none of its own, and it is not presumed to know anything more about these valuations than the man who owns the property, or than the legal assessor who has imposed upon him the particular responsibility of ascertaining what these valuations are.

The returns made to the territorial board of equalization showed that the assessed value of the property of the Territory was twenty-eight millions of dollars. This board changed the sum of these assessments to over thirty-nine millions of dollars, a raise of more than one-third in the valuation of the property of the Territory.

The record in this case from the trial court does not

tell us, in any of its findings or conclusions, whether the
falsehood which it found lies at the basis of this assess-
ment, consisted of perjury on the part of all the tax
payers to the extent of one-third of the property, or on
the part of one-third of the tax payers with reference to
all of their property, or whether scattered indiscrimi-
nately throughout the Territory there have been such an
undetermined number of false returns as involve one-
third of the property of the Territory. But that the find-
ing of the court involves some one of these conclusions is
obvious, or else it is obvious that the decision of the court
is wrong; for if the decision of the court is right, then
some one of these three falsehoods must have been com-
mitted in making the returns, and we cannot escape from
this conclusion except by saying the decision of the court
is wrong. I think the latter is the correct conclusion,
f or the reason that there is nothing whatever in the record
to show that any false returns of property or valuations
were made, and the legislature has given to the terri-
torial board of equalization no power to hear and deter-
mine the question as to whether or not there has been
any lack of observance of the law in the assessment of
property. It has only given it the power "to examine the
various county assessments and to equalize the same."
If the legislature had intended that the territorial board
of equalization should determine whether or not the prop-
erty was correctly assessed at its cash value, it would have
given the board some means and power to determine this
question. It has only given it, however, the power to
equalize these assessments, the power to adjust dif-
ferences made in the assessments in the various counties,
as it has given to the county boards power to adjust dif-

ferences in the assessments in county by the assessors of the different townships, in order that the provision of sec. 6 of the Organic Act that "all property subject to taxation shall be taxed in proportion to its value" shoul. be enforced as the fundamental and just rule for the apportionment of the burdens of taxation. The conclusion of the court, in any event, instead of enforcing the one provision of the statute, that all property shall be assessed at its actual cash value, has manifestly violated this rule, and it has done it by the punishment of the innocent rather than the punishment of the guilty.

Suppose we take that construction most favorable to the honesty of those who have listed their property for taxation, and to the honesty of the assessors of the Territory, and we then have the conclusion that the falsehood that the court substantially finds in the return of the property only existed in one-third of the assessments. If that is true, than the other two-thirds must have been correctly returned. To the extent of the increase of the per cent. upon the assessments in the various counties, just so far, then, two-thirds of the property of the Territory, honestly assessed and returned, would, if the decision of the court were permitted to stand as the law, be now placed upon the tax rolls at an increased valuation. This, in my judgment, is the inevitable result of such a conclusion, and I believe if that were sustained many honest tax payers of the Territory would be required to pay a tax at a high rate upon the assessments now entered upon the tax rolls,at an amount much greater than represents the actual cash value of their property.

Suppose, in the case now under consideration from Logan county, a man owned property to the value of one

thousand dollars; he honestly assessed it and swore to it, and the assessor honestly entered it and swore to it, at what it was actually worth, one thousand dollars. The increase in this assessment places his property on the tax rolls at fourteen hundred and fifty dollars, and this is done because the board, without evidence, without proof, with no power to determine the fact, has found that some other tax payers of that county have made a false return of their property. Is this equity? Is this justice? I say no. It is the punishment of the innocent in order that the guilty may be required to do what is right. This principle has never met the approval of an appellate court, and it cannot find sanction in this one.

My candid belief is that the property of the Territory was originally assessed at its fair cash value, and that few, if any, of the tax payers swore falsely with reference to their property; and if this were, in fact, done in isolated and very few cases, it was more than compensated for in the returns by the high assessment at which, owing to the peculiar conditions which existed, the assessors have insisted upon entering the citizens' property.

It is a part of the history of this Territory, that the courts have been, time and again, appealed to, to hold that the 4 per cent. limitation contained in the act of congress of July 30, 1886, was wholly inapplicable to this Territory, by reason of its organization subsequent to that legislation, and by reason of the fact that the counties of the Territory were all organized before there was a possibility of an assessment. But by the decision in *Hoffman v. Commissioners of Pawnee County*, 3 Okla. 325, the question was settled in favor of the existence of the 4 per cent. limitation.

Prior to the 1895 assessment, as is well known by those who understand the history of this Territory, the judges of this court, then acting, all entertained the view that the 4 per cent. limitation was in force in this Territory, and either prevented any indebtedness to exceed 4 per cent. of the property, as shown by the assessment rolls when the same should be returned, or became operative from and after the first assessment, or prevented the contracting of any indebtedness until there should first be an assessment, and then not to exceed 4 per cent., and it was, as I believe, to escape the effect of this decision just named that the board of equalization was persuaded to make the raise in these assessments in the various counties, and not, in fact, to enter the property at its actual cash value because false returns had been made. And those persons who were unable to evade the force of this congressional limitation directly would, if the decision of the court below was sustained, be able to do it indirectly. This, in my view of it, would be the unwitting effect of the decision of the court below, and to a decision which would so operate of course I could not agree.

If this court sustains a raise of eleven millions of dollars in 1895, it must, if the board shall so choose, and the legislature should fail to be loyal enough to pass a statute that could not be construed into giving such power, sustain a raise of ten times that amount, this year or next year, and the congressional limitation which we have held to be in force here will amount to nothing more than a meaningless collection of words of the English language.

If there has been, however, any falsehood practiced in making these returns, I think the statute gives ample

power to correct it. It provides for township and city boards of equalization who have power to hear complaints of parties who feel aggrieved at the assessments made, and that the decisions of these boards shall be final as to individual assessments. Before that board was the place to have made complaint if the assessed and the assessor had made false returns. That board had power to hear complaints, and therefore power to determine the complaints and had power to correct mistakes, errors and deception, if any was practiced in making individual assessments, and I can see no reason why the determination of that board ought not to be as final upon the officers whose duty it is to administer the law, as upon the individual whose duty it is to obey it. If these complaints had been made before that board, as the officers could well have made them if there was any ground therefor, then the one-third of the tax payers who made such false returns of their property could have been met by a proper raise thereof, and the trouble properly corrected instead of burdening two-thirds of the tax payers of the county with an illegal increase in their taxation.

The only authority cited in support of the former conclusion of this court, in following the decision in the case of *Wallace v. Bullen,* sustaining the claim that the territorial board of equalization had the power to make these assesments, is the case of *Black v. McGonigle,* (Missouri,) 15 Southwestern 615. That case, I claim, is no support whatever for the authority which the territorial board of equalizationhas attempted to exercise, and a citation from the opinion will show that it was upon an entirely different character of statute from that under consideration in this case. It is there stated:

"The first contention of the appellant is that the action of the board in raising the assessed values of real estate in all the townships, except one, by a single order on a per centum basis, is illegal and void. The propositions contained in this objection must, of course, be determined by the statute. Section 6672, Rev. St. 1879, gives to the board power 'to hear complaints, and to equalize the valuation and assessments upon all real and personal property within the county;' and it is then made the duty of the board 'to equalize the valuations and assessments of all such property, both real and personal, * * so that each tract of land shall be entered on the tax book at its true value.' According to the plain letter of the statute, the board has not only the power to hear complaints, but it has the power, of its own motion, to equalize the valuations for the purposes named in the law, namely, so that each tract of land shall be entered at its 'true value.' In performing these duties, the board acts judicially; this has been often held, and the very nature of the duty to be performed makes it a judicial one."

Now, there was an express power given to the board of equalization in that case "to hear complaints," and to equalize the valuation, as well as the assessments upon the property, and it was their duty to equalize the valuations and assessments "so that each tract of land shall be entered on the tax book at its true value." Under our statute, there is no power whatever given to this board to equalize any valuations. All they are given power to do is "to examine the various county assessments and to equalize the same." It seems to me too patent for argument that that case can be no authority in this.

The case of *Kimball v. Merchants Savings, Loan & Trust Company*, 89 Ill. 611, is a decision from one of the leading supreme courts of the country, which, if followed,

would have led the court then to a different conclusion. I think it, in principle, is squarely in point. It is true that the raise which was objected to, and the only raise in the assessment which was objected to in that case, and therefore the only one under consideration, was that made by the county board of equalization. But what difference does it make whether it was a county board of equalization or a territorial board of equalization? The powers of these boards are purely legislative. They have no power whatever save such as the legislature grants, and the power granted to the territorial board of equalization can give no greater authority than a like grant of power to a county board of equalization. They both, in my judgment, stand upon the same principle, and must abide the same determination. The county board of equalization in that case added 20 per cent to the valuation of personal property in the town of South Chicago, but made no changes in any other towns. This per cent. made an increase in the aggregate value of the assessed property of that town of over two millions of dollars, and thereby increased by a large per cent. the aggregate assessed value of the the entire property of the county. This was done under a statute which provided that the board.

"Shall ascertain whether the valuations in one town or district bear a just relation to all the towns or districts in the county, and may increase or diminish the aggregate valuation of property in any town or district by adding or deducting such sum upon the hundred dollars as may be necessary to produce a just relation between all the valuations of property in the county, but shall, in no instance, reduce the aggregate valuations of all the towns or districts below the aggregate valuation

thereof as made by the assessors, neither shall it increase the aggregate valuations of all the towns or districts except in such an amount as may be actually necessary and incidental to a proper and just equalization."

A majority of the court in the case of *Wallace v.Bullen* seem to take the view that this Illinois case is not in point, because of the provision of this Illinois statute prohibiting this board of equalization from making an increase in the aggregate valuations of a town or district. I think this entirely too narrow a view to take of this decision. It is true this limitation is mentioned in the opinion, but the decision is based as strongly upon the want of authority in this board to make an increase in the assessments, as it is upon the language of the limitation contained in the statute.

This court said in its opinion in that case:

"It follows, as a matter of course, that any material increase, beyond what was actually necessary or incidental, of the aggregate valuations of all the towns of the county, as was made in this case, is without authority of law, and must for that reason be void. It is not merely an irregular or erroneous exercise of powers conferred, but it is an imposition of taxes in a case where no authority is given by the statute, which is the source of all power a county board may rightfully exercise in such matters."

It will be seen that this part of the opinion, which is indeed the stronger language of it, absolutely omits any reference to the language in the limitation upon the power of this board, but squarely says that no authority to make this increase was given by statute, and that the statute is the source of all power that the county board could exercise in the case. And this principle, indeed, has been so often reiterated by the courts and law writers, that it ought not to be disputed. If it is a ques-

tion, then, of want of authority, it does not lessen the effect of the opinion that it was made under a statute which also contained a limitation. Legislatures, in fact, often provide such a limitation where authority would not etxist without it, and the fact that the limitation is omitted in a particular case is no argument that the authority exists except for such restriction.

I think a little addition to the extract which the court in that case took from this opinion may give us a better idea of what the court meant than that which was given. The part there quoted by the court, with the addition, is as follows:

"The case of *Scammon v. The City of Chicago*, 44 Ill. 269, cited, is not an authority in the case we are considering That case arose under a different law—one that conferred power on the board acting for the purpose of equalizing assessments 'to add to, take from, or otherwise correct and revise the same' without imposing any limitations upon their discretion in the matter. It is a misapprehension to suppose the present revenue law invests county boards, in the matter of equalizing assessments between the several town or districts of the county, with a discretion to diminish in any instance, or raise, the aggregate valuations made by the assessors beyond an amount that may be actually necessary or incidental to a proper and just equalization. Had the legislature invested county boards with a discretion as to the amount that should be added or deducted in any given case, in equalizing valuations, without imposing restrictions, then the rule declared in *Law v. The People*, 87 Ill. 385, as to reviewing such discretion, would apply. But the fallacy of the argument on this branch of the case lies in the assumption county boards have a discretion in such matters. Such is not the case. The powers such boards may rightfully exercise are defined, and limits fixed beyond

which they may not go.    All acts beyond the restrictions imposed are void, as being without warrant of law."

The syllabus of this case, on the point in controversy, says:

"If any material increase is made by a county board in the aggregate amount of all the towns or districts, in equalizing the valuation between the different towns beyond what is actually necessary or incidental, it is without authority of law, and void.

"Where a county board of equalization raised the tax on personal property in one town 20 per cent., without any corresponding deduction in other towns, so that the valuation of taxable property of the county was raised $2,000,000, and the state board, taking the aggregate valuation of the several counties as a basis, as the law required, raised the valuation of personal property in the same county 57 per cent., which was added to the increased valuation as made by the county board, it was held, that the proceedings of the county board increasing the valuation were not merely irregular, but without sanction of law, and void, and the tax on such increased valuation was enjoined."

It will be seen from this language taken from the syllabus, that not one word is said about the restriction contained in the statute, but it is based entirely upon the proposition that the board did not possess authority to make the raise, and therefore the raise was void.    And this view of the case has been taken by several eminent tax writers on the question of taxation.

Desty, in his work on taxation, vol. 1, page 496, under the title "Board of Equalization," says:   "An increase in the aggregate amount of all the towns or districts in equalizing the valuation between the different towns beyond what is actually necessary or incidental is without authority of law, and is void," citing this Illinois case as authority for this doctrine.

Cooley, in his work on taxation, page 418, says, under the title "Review of Assessments:" "Powers of Board. These tribunals are mere creatures of the statute, and must look to it for all their powers," citing, also, this case, and a large number of other authorities in support of the rule. I think, then, it is a fair statement to make, that the case of *Kimball v. The Merchants Savings, Loan & Trust Company*, decided that a board of equalization has no power to make a material increase in the aggregate assessment of property, unless it is given authority so to do by the act which creates it.

The case of *Law v. The People*, referred to, was one in which the validity of the assessment of corporate property at one-half of its value was raised. The statute provided that the state board should assess corporate property at its fair cash value. The constitution required that the burden of taxation should be made to bear equally upon all property, whether owned by private persons or corporations. It was ascertained in making the assessment of corporate property, that the private property was assessed at one-half of its value, and for that reason the state board, also, in order to comply with the requirements of the constitution, assessed the corporate property upon the same basis; and it was held in this case that the state board had to act upon the valuations as returned to it by the local officers, notwithstanding it might be shown that the local officers had not complied with the requirements of the statute that the property should be assessed at its cash value. The opinion states:

"It was obligatory upon the state board to equalize valuations of property under the law, as the same had

been certified by the local officers making the same, and it is difficult to appreciate the argument, the state board had no authority to equalize the valuations of property on the basis of 50 per cent. of its cash value. What possible difference could it make whether the state board regarded the valuations of property made by local assessors as having been made upon a basis of 50 per cent., or upon its fair cash value? In either case it was the duty of the state board to equalize the valuations as they came before them."

I think the same principle is applicable to the territorial board of equalization. It makes no difference, as a matter of fact, whether the property of the Territory has been assessed at its actual cash value or two-thirds of its cash value. The territorial board must equalize the county assessments, as returned, just the same. It has no power to change the aggregate of the county valuations. All it has to deal with is the assessments, and the assessments it must equalize, and not re-assess. The remedy for improper valuations, if they were made, of which the board of equalization had no proof, and no power to hear any proof whatever, was before other bodies and other officers.

It is not my opinion that a review of the decisions and authorities on this momentous question, all of which, on a statute similar to ours, are opposed to the former conclusion which this court reached, will convince either the bar or the people of the Territory that those who oppose this unlawful, as well as unjust, taxation laid upon them by the unauthorized act of the territorial board of equalization, are subject to the charge to which the court gave countenance by its approval in its former decision, written in the case of *Wallace v. Bullen,* that we

have departed from the ordinary and common rules of construing statutes, and have resorted to a strained construction thereof, in violation of the public honor, faith and credit of the Territory.   I think the court there might have been able to use more forcible and convincing language than it did upon this phase of the case, had it reviewed this charge as opposed to its own decision, instead of using it as an argument against the position then affirmed by a minority, and now by a majority, of the court.   The withholding of the hand of the collecting officer from the enforcement of this illegal tax is but gi￼ ing effect to the plain and unequivocal language of the statutes, and certainly that ought hardly to be charged to be resorting to a strained construction.   We have resorted to no strained construction, of these statutes.   In fact, they are so plain and certain in their language that there is nothing in them that admits of construction; but if that were a duty devolving upon us in this case, it has already been performed for us by man￼ of the ablest courts and judges of the country, with whose opinions the majority of this court, in the case of *Wallace v. Bullen,* expressed the first effective, if not the only, dissent.

Is it a violation of the public honor, faith and credit of the Territory to say that the collecting officer must be clothed with the authority of the law before he lays his hands upon the property of the citizen?   Is it a disregard of the public honor, faith and credit of these people to say that it is the duty of the courts of this Territory to permit the public officers to collect only such tax as the law has said they may demand?   Is the giving effect to the enactments of the legislature a departure from the

public honor, faith and credit?   It seems to me the public honor, faith and credit can as well be maintained by the courts being guided by the law's ancient, time-honored and respected land-marks, and saying every official exaction must be based upon authority first given, as by saying that although the imposition may be illegal, unauthorized and void, yet it must be enforced to uphold the public honor, faith and credit.   Let us enforce the law as it is plainly written for us, and no perverted sentiment of public honor, faith and credit, urged by those who have been their first violators, will ever make *Justicia* blush because of what we have written.

A kindred argument was answered by the supreme court of the United States, in the case of *Lake County v. Rollins*, 130 U. S. 662, by quoting the following magnificent language from *Law v. The People*, 87 Ill. 385:

"But, should it work hardship to individuals, that by no means warrants the violation of a plain and emphatic provision of the constitution.   The liberty of the citizen, and his security in all his rights, in a large degree depend upon a rigid adherence to the provisions of the constitution and laws, and their faithful performance.   If courts, to avoid hardships, may disregard and refuse to enforce their provisions, then the security of the citizen is imperiled.   Then the will, it may be the unbridled will, of the judge, would usurp the place of the constitution and laws, and the violation of one provision is liable to speedily become a precedent for another, perhaps more flagrant, until all constitutional and legal barriers are destroyed, and none are secure in their rights.   Nor are we justified in resorting to strained construction or astute interpretation, to avoid the intention of the framers of the constitution, or the statutes adopted under it, even to relieve against individual or local hardships.   If unwise or hard in their operation, the power that adopted

can repeal or amend, and remove the inconvenient
The power to do so has been wisely withheld from the
courts, their functions only being to enforce the laws as
they find them enacted."

Concurring opinion by

KEATON, J.: I concur fully with the conclusion reached
by Justice McAtee in the foregoing opinion and with
most of the reasoning therein contained; hence, were the
question decided not one of extraordinary importance,
and one which has heretofore been decided by a majority
of this court, directly contrary to the position now taken,
by a majority of the members thereof, I should content
myself with merely concurring with the views so ably
expressed by my brother, McAtee, without attempting to
elaborate them or to give any additional reasons therefor.
In this connection, however, I will be pardoned the state-
ment that, in my judgment, both the foregoing and the
majority opinion in *Wallace v. Bullen* go somewhat beyond
the matters presented by the record and deal too much
with supposed consequences and the alleged motives of
those assumed to be peculiarly interested in the deter-
mination of the question involved, which, as I understand
it, is solely one of statutory construction.

There is one proposition raised by the pleadings and
urged by the defendants in this and the other similar
cases, which has not been noticed in either of the pre-
pared opinions. It is, in substance, that, the value of all
the property in the Territory having been raised to a
common plane, no tax payer is injured thereby, as the
rate of taxation was correspondingly reduced and the

amount of taxes levied in each county and the amount required of each tax payer were the same as they would have been had the raise not been made by the territorial board of equalization. In the answer of defendants in the case at bar, this proposition is sought to be raised by the following allegations:

"Defendants say that the rate of taxation in said Logan county, was fixed by the board of county commissioners, subsequent to said action by the territorial board of equalization, upon the basis of the increased valuation of the property in said Logan county, as fixed by the territorial board of equalization, as aforesaid; that the said board of county commissioners, at the time of fixing said rates, made a careful and conservative estimate of the expenses of said county for the current year, 1895, and levied only a sufficient rate of taxation to meet said expense; that the amount of money required to be paid as taxes for said county is no greater than as though said increase by the said territorial board of equalization had not been made; that if said increase in valuation had not been made the said board of county commissioners would have been compelled to increase the rate of taxation, in order to meet the actual and necessary expenses of said county."

Conceding that there are sufficient facts plead in said answer to properly present the point relied on, which, to say the least, is extremely doubtful, the contention, in my opinion, is not tenable for several reasons, among which are the following: First. It would be wholly impracticable for a court to determine, with any degree of certainty, that an individual's tax has not been increased by such raise; second, the statute authorizes an injunction "to enjoin the illegal levy of any tax, charge or assessment, or the collection of any illegal tax, charge or assessment, or any proceeding to enforce the same;"

(sec. 265, Procedure-Civil;) third, to sustain this contention would be to give said board of equalization unlimited power in this regard and the value of all the property in the Territory, except railroads, might be raised to ten, or even ten thousand times its actual value, and, as this board is required to assess railroad property at "its actual cash value," any increase of the other taxable property beyond such value would necessarily impose an unjust burden thereon.

I heartily agree with what is said in the foregoing opinion as to its being utterly impossible, under the law, for the territorial board of equalization to ascertain the true, or actual, value of any classes of property except that which it is said board's duty to assess. This position is made perfectly apparent by the provisions of art. 4, ch. 43, Session Laws, 1895, which make it the duty of said board "to assess all the property of the railroads and railroad corporations in the Territory of Oklahoma at its actual cash value;" and in order that said value may be ascertained "every person, company or corporation operating or constructing a railroad in this Territory" is required to "return sworn lists or schedules of the taxable property of said railroad company or corporation as hereinafter provided."

It is then specifically provided, in sec. 5 of said article, how and by whom these lists or schedules shall be made, what they shall contain, etc. It will suffice here to say that said lists or schedules shall contain a sufficient statement of the amount, character and value of such railroad property to enable said board to determine, almost, if not quite, definitely, the actual cash value thereof. Then, in sec. 7 of said article, it is further provided that

if the proper officers fail to make the required statements or schedules, the person, company or corporation owning such railroad property "shall forfeit, as a penalty, not less than five thousand dollars for each offense," etc. It is still further provided in sec. 8, of said article, that the board of railroad assessors shall have power to compel the attendance of the officers and other agents of a railroad company as witnesses to testify before said board concerning any necessary matters to enable said board to properly assess such property, and that, "any president, secretary, receiver, accounting officer, servant or agent of any railroad company, who shall knowingly make any false answer to any question put to him by such board or by its order, touching the business, property, money and credits and value thereof, of said railroad company, shall be guilty of perjury, and it shall be the duty of the president of said board to prosecute any person liable to the penalties of this section immediately upon the accruing of the liability of such prosecution."

How, then, can it be asserted that the legislature, which understood that all of the foregoing provisions were necessary to enable these officers, (when acting as the board of railroad assessors,) to determine the actual cash value of the railroad property of the Territory, could possibly have intended that said officers, (when acting as the territorial board of equalization,) should assume to fix the actual cash value of the other property of the Territory at a different amount from that fixed by the various assessors thereof, as equalized by the township and county boards of equalization, without any means whatever for ascertaining same, except abstracts of the assessment rolls of the different counties?

Another phase of the question, which seems to have been overlooked by the other justices who have prepared opinion herein is, that, if this court holds that said board of equalization has the power to raise the aggregate valuation of the taxable property of the Territory, as shown by the abstracts of the assessment rolls of all the counties, by a parity of reasoning we must also hold that it is vested with the power to reduce said aggregate valuation and, so far as the writer can discern, there will be no adequate means of correcting the action of said board, no matter to what extent it may, in the future, increase or decrease such aggregate value. It certainly will not be contended that a tax payer can maintain a proceeding in court to review and correct the action of said board in this regard upon the sole ground that his property has been over valued thereby and, as there is no appeal therefrom, I can see no possible remedy, if this power is conceded, that the tax payers of the Territory would have to correct such action, should the territorial board of equalization increase the aggregate valuation of their property to twice, or even many more times, its "true cash value." On the other hand, I can see no means with which to review and correct the action of said board should it decrease the valuation of the property, of the territory to one-half, or even a less portion, of its "true cash value." Can it be possible that the legislature ever intended to invest this body with such tremendous powers, to be exercised without the right of a hearing on the part of those affected thereby, by providing simply that "it shall be the duty of said board to examine the various county assessments and to equalize same?" The objections just suggested are not satisfied by saying that, as

the territorial board of equalization is composed of sworn officers, it will be presumed that they will fairly and honestly perform the duties assumed by them, for this argument will apply with greater force to the local assessors who are also sworn officers, and whose duties are definitely prescribed by law, and heavy penalties provided for a failure, on their part, to honestly and faithfully perform them.

Confer this unlimited and absolute power and some future territorial board of equalization, surrounded by different environments and actuated by different considerations from those which seem in part at least, to have influenced the one whose action is now under consideration, may, by an arbitrary reduction of the aggregate assessed value of the property of this Territory, accomplish the very result which is sought to be avoided by the majority opinion of this court in *Wallace v. Bullen,* to-wit: "The violation of private rights, and the impairment of public faith, and might seriously impair the usefulness of territorial, county and municipal governments, by depriving them of the just revenue necessary for the proper discharge of their functions."

It may be urged that there is no possible danger of any board of equalization, in this Territory, ever reducing the aggregate assessed value of the property within its jurisdiction and, judging from precedents, there would seem to be considerable plausibility in this contention; but courts, when they look to consequences at all as an aid in interpreting the meaning of a statute and the intention of the legislature as expressed thereby,

must take into consideration all such consequences as are made possible by a certain construction, and which can logically be expected to follow same.

I accede to the suggestion, in the opinion of the court in *Wallace v. Bullen*, to the effect that the territorial board must necessarily be conceded the power to raise or lower the aggregate assessed value of the property of a county in order to properly perform its duties as a board of equalization; but, when used solely for the proper exercise of these functions, this power is not an arbitrary and unlimited one since it is confined strictly within established and well defined limits and, while restricted to such purpose, it can never be made an engine of oppression on the one hand or of repudiation on the other; and, although the proper exercise of said power may result in increasing the assessed valuation of the property of many tax payers, they must submit thereto in order that the burdens of taxation shall be so distributed as to require each to contribute to the support of government in proportion to the value of his property. To this extent the power to change valuations by boards of equalization is legitimate and proper, but to extend it beyond this scope, without providing those whose property is re-valued with an opportunity to be heard, is to remove all restrictions upon the power of the state to tax the property of the citizen. (See *South Platte Land Co. v. Buffalo Co.*, 7 Neb. 253, wherein it is held: "The county commissioners, acting as a board of equalization, cannot raise the assessment in property without giving notice to the owner; and if they do so increase the assessment of property without notice, they act without jurisdiction of the person or subject matter, and their proceedings are void, and of no effect.")

In the body of the opinion, Chief Justice Gantt, speaking for the court, says:

"Therefore the main question presented for consideration is, whether the commissioners, acting as a board of equalization, can re-assess property without giving notice to the owner. * * But it is insisted that as sec. 27 constitutes the county commissioners also a board of equalization, and provides that the 'said board shall have the right to raise or lower the valuations of any or all property, (except property valued by the state board,) as may be deemed just and proper,' absolute power resides in this board to re-assess property as it may choose; and that as the statute fixes the time when the board shall meet, it may exercise this power without giving notice to the owner of the property. * * Certainly such absolute power to tax the property of the citizen without notice would establish a precedent too dangerous to be tolerated, and it is not to be supposed that it was the intention of the legislature to confer on the board a power so dangerous and so liable to abuse. * * Tax his property, and the constitution declares that no man shall be deprived of his property without due process of law. * * But if the proposition contended for is maintainable, then the board, by its arbitrary act, may, without due process of law, raise the tax on property of the citizen, without limit and without his knowledge. * *. It seems to me that if the proposition contended for on the part of the defendants is to be maintained it must be at the sacrifice of those great principles upon which private rights repose for their security, and which are secured by the solemn guaranties of the constitution, and therefore I must conclude that the county commissioners, acting as a board of equalization, cannot interfere with those rights and re-assess property without first giving notice to the owner."

I fully agree with the conclusion of my associates, (Justices McAtee and Bierer,) that the action of the ter-

ritorial board of equalization, in raising the aggregate assessed valuation of all the property of the Territory, (except railroad property,) more than $11,000,000, as shown by the record in this case, amounted to a re-assessment of all the property whose aggregate assessed valuation was so raised rather than an equalization thereof. While it is true that "the valuation of Kingfisher county was adopted as a basis for equalization," and the valuation of each of the other counties raised thereto, yet the same reasoning which will support this raise, to-wit: the power and duty of said board to see that "the law requiring all the property to be assessed at its actual cash value" is complied with, will also support a raise of the valuations of all the counties of the Territory to some common plane, entirely above that of any county, which, in the opinion of a majority of the members of this board, would come most nearly fulfilling the requirements of the law. In fact, such was the practical effect of the action of said board in this instance since the aggregate valuation of the taxable property of Kingfisher county, which was used as the basis for said action, had previously been increased, by the county board of equalization, in the sum of $382,335.75, being an increase of about 25 per cent. over and above the aggregate valuation fixed by the several assessors of the taxing districts of said county, as is shown by the record in the case of *Lee v. Mehew*, now pending before this court, and submitted, to abide the decision in the case at bar, and the other cases involving the same question. In other words, the majority of the members of this board have attempted to exercise the powers and duties conferred by law upon the

assessors of the Territory, except that they have re-assessed the taxable property thereof by county, instead of individual assessments.

I also entirely agree with chose of my associates who have reached the conclusion that the legislature never conferred, and never intended to confer, any such juris-diction or authority upon this board; and I go still farther and hold that the legislature itself is not invested with the power to confer such authority, unless it also provide for a hearing before said board on the part of those whose property is to be re-assessed thereby. For-tunately for the property-owning citizen, under the sacred guaranty of our federal constitution, no person can be deprived of his property "without due process of law," and it has been the unanimous holding of the courts of this country that the attempted exercise of the power on the part of a state to provide for the assessing of the property of her citizens, or any portion thereof, for taxation, without an opportunity for them to be heard at the time, or after the date, of such assessment, is in violation of this constitutional provision and therefore nugatory. The fact that our law makes ample provision for such a hearing before the township boards of equali-zation is no compliance with said constitutional guar-anty, if both the county and territorial boards of equali-zation (or either of them) can, subsequently thereto, re-assess the property listed for taxation. (The Railroad Tax cases, 13 Fed. 722, 8 Sawyer 270.)

Perhaps the leading and best reasoned case to be found upon this proposition is that of *Stuart v. Palmer*, 74 N. Y. 183, wherein the very able court of that state, per Earl, J., say, in part, the following:

"It will be observed that two assessments are provided for by the acts; one for the damages awarded to the owners of the land, under sec. 3 of the act of 1869, as amended, and another for the expense of regulating, grading, etc., under sec. 4, as amended. The former assessment was to be made and confirmed after proper notice to and hearing of the persons interested. The latter assessment could be made without any notice to or hearing of any person. The law requires no notice, and a provision for notice cannot be implied. Upon the assumption that the law was valid, there was ample authority for the commissioners to make the assessment without any notice or hearing; and the assessment, when once made in the exercise of the arbitrary discretion thus conferred, would be unassailable, and however unjust, unfair and oppressive, would be subject to no review, unless fraud or corruption could be shown.

"I am of the opinion that the constitution sanctions no law imposing such an assessment, without a notice to, and a hearing or an opportunity of a hearing by the owners of the property to be assessed. It is not enough that the owners may by chance have notice, or that they may as a matter of favor have a hearing. The law must require notice to them, and give them the right to a hearing and an opportunity to be heard. It matters not, upon the question of the constitutionality of such a law, that the assessment has, in fact, been fairly apportioned. The constitutional validity of law is to be tested, not by what has been done under it, but by what may by its authority be done. The legislature may prescribe the kind of notice and the mode in which it shall be given, but it cannot dispense with all notice.

"The legislature can no more arbitrarily impose an assessment for which property may be taken and sold than it can render a judgment against a person without a hearing. It is a rule founded on the first principles of natural justice, older than written constitutions, that a citizen shall not be deprived of his life, liberty or prop-

erty without an opportunity to be heard in defense of his rights, and the constitutional provision that no person shall be deprived of these 'without due process of law' has its foundation on this rule. This provision is the most important guaranty of personal rights to be found in the federal or state constitution. It is a limitation upon arbitrary power, and is a guaranty against arbitrary legislation. No citizen shall arbitrarily be deprived of his life, liberty or property. This the legislature cannot do nor authorize to be done. 'Due process of law' is not confined to judicial proceedings, but extends to every case which may deprive a citizen of life, liberty or property, whether the proceeding be judicial, administrative or executive in its nature. (*Weimer v. Bunbury,* 30 Mich. 201.) This great guaranty is always and everywhere present to protect the citizen against arbitrary interference with these sacred rights.

"It has always been the general rule in this country in every system of assessment and taxation, to give the person to be assessed an opportunity to be heard at some stage of the proceeding. That 'due process of law' requires this, has been quite uniformly recognized.

"No case it is believed can be found in which it was decided that this constitutional guaranty did not extend to cases of assessments, and yet we may infer from certain dicta of judges that their attention was not called to it, or that they lost sight of it in the cases which they were considering. It has sometimes been intimated that a citizen is not deprived of his property within the meaning of this constitutional provision by the imposition of an assessment. It might as well be said that he is not deprived of his property by a judgment entered against him. A judgment does not take property until it is enforced, and then it takes the real or personal property of the debtor. So an assessment may generally be enforced not only against the real estate upon which it is a lien, but as in this case against the personal property

of the owner also, and by it he may just as much be deprived of his property, and in the same sense as the judgment debtor is deprived of his by the judgment."

The principles declared by the supreme court of New York in the case just cited and quoted from are recognized and affirmed in numerous decisions, both state and federal, among them being the following: *South Platte Land Co. v. Buffalo Co., supra; People v. Union*, 31 Cal. 138; *Slaughter v. City of Louisville*, (Ky.) 8 S. W. 917; *Davidson v. Board of Admnr's of New Orleans*, 96 U. S. 97; *Hagar v. Reclamation Dist. No. 108*, 111 U. S. 701; *Spencer v. Merchant*, 125 U. S. 345; *Winona & St. Peter Land Co. v. Minnesota*, 159 U. S. 526, and cases therein cited; the Railroad Tax cases, *supra*, and note.

The valuation or assessment of property for the purpose of imposing an *ad valorem* tax thereon is a judicial act which cannot be exercised by the legislature itself nor delegated by it to any other body or person to be exercised without due notice to, and a right to be heard by, those affected thereby. See *Slaughter v. City of Louisville, supra*, wherein it is held that: "The valuation or assessment of property is not only a judicial, but an indispensible, act, in order to levy *ad valorem* taxes upon it. In the nature of the thing, there must be an assessment. * * Can the legislature, in order to authorize the collection of *ad valorem* taxes, fix the valuation upon the property to be taxed? It seems to be well settled that the legislature, as the law making department of the state government, has no constitutional power to fix the valuation of property which is to be taxed upon *ad valorem* principles. The reason for this rule is that the legislative department has no judicial or executive

power; and, as the valuation is judicial, it follows that the legislature has no constitutional power to make the valuation. Taxes are not debts. 'Debts are obligations founded upon contracts, express or implied;' but taxes are impositions levied for the support of the state government, or for county or city purposes. When they are imposed by authority, they operate on the tax payer *in invitum.* When they take the form of a per centum, there must be a valuation as a basis of the power to levy and collect them. The tax payer is entitled to be heard in fixing this valuation. The basis of the right to collect taxes from him consists in the valuation of his property; and to deny him the right to be heard in making this valuation would be the taking of his property without due process of law. The valuation is the due process of law by which the right to take his property for taxation is begun; and, the legislature having no judicial or executive power, it cannot make the valuation; but the valuation must be made by some person authorized to exercise judicial power, and such person is an assessor."

The principles announced in the cases herein cited upon this constitutional question in no wise conflict with the decision of the supreme court of Missouri in *Black v. McGonigle,* 103 Mo. 78, 15 S. W. 615, which seems to have been relied upon as the sole support of authority for the conclusion of a majority of this court in *Wallace v. Bullen.* The decision in the Missouri case is based upon statutes amply providing for notice to, and the opportunity of a hearing by, all persons, the valuation of whose real estate had been increased by the county board of equalization to comply with the requirement "that each tract of land shall be entered on the tract book at its true value," and

it appears that the board was not authorized to change the valuations of personal property for any such purpose. In addition to the authority given said board, by sec. 6672, Rev. St. Mo. 1879, "to hear complaints," sec. 6673 thereof, as amended by act of 1887, provides:

"But, after the board shall have raised the valuation of such real estate, it shall give notice of the fact, specifying the property and the amount raised, (to the persons owning or controlling the same, by personal notice through the mail, or by advertisement in any paper published in the county,) and that said board will meet on the fourth Monday of April, to hear reasons. if any may be given, why such increase should not be made."

In discussing the sufficiency of the notice given by the board of equalization in that case said supreme court of Missouri says, among other things, that, "the order of the board on the 3rd of April raised the assessed value of all lands in Lyon township 50 per cent., while the notice given by the clerk showed an increase of 50 cents on the $100 valuation. There is certainly a vast difference between the order as made and the notice given. The notice, as given cannot be said to specify the amount raised. The tax payer might well disregard the increase as specified in the notice, and yet have a serious and valid objection to the increase made by the board. The question then arises whether the board, on discovering the mistake, had the power to order a new notice."

Thus it is seen that *Black v. McGonigle, supra,* instead of supporting the conclusion of a majority of this court in *Wallace v. Bullen,* is strictly in line with the many other able and well considered decisions holding that the owners must be afforded the right of a hearing, at some stage

of the proceedings, relative to the assessment of their property before the same can be charged with an *ad valorem* tax.

I concede that, as the law of this Territory fixes the time and place for the meetings of the county and territorial boards of equalization, this would, probably, be a sufficient notice to the tax payers to enable them to appear before said boards for the purpose of adjusting any grievances they may have concerning the matter of the assessment of their property but, as the law gives them no right of hearing before such bodies, they are in no better position in this regard than if they had no notice whatever of the time and place of such meetings. (See *Hagar v. Reclamation Dist. No. 108*, and Railroad Tax cases, *supra.*)

To sustain a law providing for the assesment or reassessment of the taxable property of our Territory, without the right of a hearing on the part of those whose property is to be so assessed thereunder, would be little, if any, less dangerous, as a precedent, than to uphold an enactment abrogating the right of trial by jury; and for this court to interpret a plain provision, authorizing and requiring the equalization of the assessed valuations of property, into such a law would, in my opinion, be to commit an error that it could never retrieve and one which, if not corrected by legislative action, must, almost inevitably, sooner or later, result in the oppression of those of our citizens who own the material wealth of the Territory, if not in the absolute confiscation of their property.

The question of whether or not the legislature has the power to authorize the territorial board of equalization to increase the assessed valuation of any county of the

Territory, even for the sole and necessary purpose of equalization, without providing those whose property valuations are thereby increased with an opportunity to be heard in opposition thereto, and without any other evidence than abstracts of the assesment rolls of the various counties of the Territory, is not now before us, and I express no opinion whatever thereon.

As both Justices McAtee and Bierer have, from the same point of view as that occupied by the writer, heretofore prepared written opinions in this cause fully covering all of the other material points raised and presented, I deem it unnecessary to extend this concurring opinion further than to reiterate that the position now taken by this court upon this, undoubtedly, the most important question which has, as yet, been presented thereto, is not only sustained by the better reason but also by the great weight of authority.